**PISTORINO & COMPANY, INC.**

v.

**UNITED STATES.**

**C.D. 4774; Court Nos. 73–10–02911, etc.**

United States Customs Court.

Oct. 30, 1978.

Doherty & Melahn, Boston, Mass. (Walter E. Doherty, Jr., and Robert Emmett Mullin, Jr., Boston, Mass., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Bruce M. Mitchell, trial attorney, Washington, D. C.) for defendant.

RAO, Judge:

These actions concern the proper tariff classification of "Plastak MT 10" and "Gesta SS 200" machines, and molds imported with these machines, exported from Italy and entered at the port of Boston in 1970, 1971 and 1972. The MT 10 is manufactured by Plastak Machinery, Italy and the SS 200 is manufactured by Gesta S.p.A., also in Italy.

The machines were assessed with duty by the district director under item 678.35, TSUS, as modified by Pres. Proc. 3822, T.D. 68–9, as machines used for molding or otherwise forming rubber or plastics articles, and parts thereof, at a duty rate of 5.5 percent ad valorem for 1972 and at a duty rate of 6.5 percent ad valorem for those machines imported in 1971.

The molds were classified in some entries under item 680.12, as modified, *supra*, at a duty rate of 8 percent ad valorem for 1970 [6.5 percent ad valorem for those imported in 1971] as "Molds of types used for metal (except ingot molds) . . . or for rubber or plastics materials: Molds used for rubber or plastics materials: . . . Other," and in some entries under item 680.15, TSUS, as modified, *supra*, at the same rates of duty (depending on date of entry) as

other molds used for rubber or plastics materials.

It is plaintiff's claim that the merchandise, both machines and molds, is properly free of duty; the machines being classifiable as shoe machinery and parts thereof under item 678.10, TSUS, and the molds being classifiable as molds, shoe machinery molds, under item 680.11, TSUS, as amended.

The question presented by this civil action is whether the imported machines belong to a class or kind of machinery chiefly used in the production of shoes, and similarly, whether the imported molds are used with a class or kind of machinery chiefly used in the production of shoes.

The operative interpretive rule is General Interpretative Rule 10 which states in part:

> (e) in the absence of special language or context which otherwise requires—
>
> > (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

> \* \* \* \* \* \*

The central issue then becomes whether the Plastak MT 10 and the Gesta SS 200 belong to a class or kind of machines susceptible of classification as machines used for molding rubber or plastics materials as determined by the district director, or whether, as claimed by plaintiff, they belong to a special class or kind of plastic molding machines chiefly used in the production of shoe parts.

Plaintiff attempted to meet its burden of proof through the testimony of three witnesses and the introduction into evidence of eleven exhibits. The evidence and testimony adduced tended to establish that the MT 10 is an injection plastic molding machine with a clamping force of 33 tons and an injection capacity of 6 ounces. To the

knowledge of plaintiff's witnesses it is used exclusively for the molding of shoe heels, although toplifts can also be produced with a modification of the platen system. The platen is approximately 6 by 11 inches and is bored out to accept only one kind of mold. According to the brochure depicting the MT 10 circulated by the manufacturer and entered into evidence by plaintiff, this machine has a clamping force of 42 tons, and produces three pairs of heels per minute or six pairs of toplifts per minute.

The SS 200 is a two-station molding machine which operates on an intrusion molding principle, that is, it utilizes a screw which is rotated through a hole which causes the plastic material to flow or be forced into the mold cavity. It can, according to the brochure introduced into evidence by plaintiff, produce two pairs of soles simultaneously at a rate of between 60 and 140 pairs of soles per hour depending on the type and size.

It was the testimony of plaintiff's witness that the MT 10 and the SS 200 would require extensive and expensive modification before they could be employed to mold other items such as combs, checkers, and screwdriver handles, since these machines cannot accept a plastic material of great hardness without changes in the hydraulic and clamping systems, although no testimony was introduced as to the amount of expense which would be involved.

The testimony of defendant's witnesses tended to establish similarities between the imported machines and general purpose molding machines manufactured in the United States and used in this country to mold a variety of articles, including shoe soles and heels. In the opinion of defendant's witnesses, Lawrence Bauer and Murray Freedman, both horizontal and vertical injection molding machines can produce a variety of articles, so long as the molds fit within the configuration of the platen, the changing of molds is an inexpensive and customary practice in the molding industry, and the imported MT 10 and SS 200 could be used, economically, to produce a number of articles such as combs, checkers and oth-

er small items, although they knew of no instance where they had been so used.

Plaintiff's evidence established that the MT 10 and the SS 200 are actually used in this country to manufacture parts of shoes, specifically, to mold shoe heels and soles. However, it is plaintiff's burden to prove that the imported machines belong to a class or kind of machines whose chief use is as shoe machinery. We do not conclude that it has met that burden.

■ When chief use is in dispute, it is usually a question of fact which should be established on the basis of positive testimony representative of an adequate geographical cross section of the country. *L. Tobert Co. v. United States*, 41 CCPA 161, 164, C.A.D. 544 (1953). Chief use envisions use by users, as a whole, of the type of article involved, and not merely individual use of the particular machines in question. *Gleeson v. United States*, 432 F.2d 1403, 58 CCPA 17, C.A.D. 998 (1970). Particularly with regard to shoe machinery, such chief use must be established by positive testimony with respect to merchandise of the same class or kind. *E. Dillingham, Inc. v. United States*, 54 CCPA 121, C.A.D. 922 (1967). This is a question of fact to be determined by the relevant facts and circumstances in each case. *Howland v. United States*, 53 CCPA 62, C.A.D. 878 (1966).

■ To determine whether the imported machines belong to a special class or kind commonly used as shoe machinery, we must look to all the pertinent circumstances. *United States v. Carborundum Co.*, 536 F.2d 373, 63 CCPA 98, C.A.D. 1172, *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976). Factors which have been considered to be pertinent in determining whether imported merchandise falls within a particular class or kind include the general physical characteristics of the merchandise; the expectations of the ultimate purchasers; the channels, class or kind of trade in which the merchandise moves, *Maher-App & Co. v. United States*, 418 F.2d 922, 57 CCPA 31, C.A.D. 973 (1969); the environment of the sale and the manner in which the merchandise is advertised and displayed, *United States v. Baltimore & Ohio R. R.*, 47 CCPA 1, C.A.D. 719 (1959); the use, if any, in the same manner as merchandise which defines the class; the economic practicality of so using the import and the recognition in the trade of this use, *Bob Stone Cordage Co. v. United States*, 51 CCPA 60, C.A.D. 838 (1964).

The first factor, the general physical characteristics of the imported merchandise, were not shown to be significantly different from those of general purpose plastic molding machines. Although there was some evidence that the maximum closing power of the MT 10 was somewhat less than that of other general purpose injection molding machines in use in this country at the time of importation, the manufacturer's brochure states that this factor is 42 tons, as compared to 50 tons for similar machines used for general injection molding in the United States. Both the MT 10 and the domestically manufactured general purpose injection machines possessed platens, injection rams, plasticizing chambers, control stations, rotating screws, clamping units and ejection mechanisms.

As to the SS 200, it also contains components common to most injection molding machines in use in this country at the time of importation. It can produce both heels and soles and performs insert molding functions. It is capable of producing a variety of articles including athletic padding, prosthetic devices and shock absorber materials.

The record shows that, although the MT 10 and the SS 200 are actually used to produce heels and soles, the Plastimac, the predecessor to the MT 10, was and is being used to mold a variety of articles and was purchased because it was a general purpose injection molding machine. No other evidence as to the expectations of the ultimate purchasers was adduced.

The manner in which the merchandise is advertised and displayed is somewhat supportive of plaintiff's position in that the machines are advertised as "heel and toplift making machine[s]" (the MT 10) and as "sole units injection moulder[s]" (the SS

200) in the respective brochures. However, defendant's witness, Murray Freedman, president of Boston Toplift and Cut Sole Company, had seen the SS 200 in operation at trade shows and had reviewed descriptive literature on it, and it was his opinion that it was a general vertical injection molding machine with an insert molding function. Thus, the manner in which it is merchandised or displayed led buyers of shoe machinery and other general purpose plastic molding machinery to conclude that the imported merchandise belongs to a class or kind of machinery defined as general purpose plastic molding machines.

The use of other general purpose plastic molding machines in making both shoe heels and shoe soles described by defendant's witnesses persuades this court that it is the mold rather than the machine that determines what type of plastic article will be produced, and that given a mold which fits within the configuration of the platen of a specific machine, almost any plastic article or part can be manufactured. This use is widely recognized in the trade.

Another factor to be considered is the commercial or economic feasibility of using the merchandise as general purpose molding machines. It is in this area that plaintiff has not sustained its burden and satisfactorily demonstrated to the court that the merchandise belongs to a special class consisting of merchandise classifiable as shoe machinery. Plaintiff's evidence to the effect that it would be "very expensive" to change the molds so that other articles than shoe soles and heels could be produced on the imported machines was more than met by the testimony of defendant's witnesses who testified that mold changing was a simple, customary function in the molding industry and that adapting the imported machines to accept other molds would not involve an expense of more than $200 to $800 dollars. Additionally, the brochure for the SS 200 states that "mold changing is extremely fast and requires no skilled labour and no tools."

---

* The instant machines cost between $12,000 and $14,000, a significant difference in price to the

Considering the pertinent factors relied upon in prior cases and those which are present here, we conclude that the imports are not of a special class or kind commonly known as shoe machinery. Considering the cases cited by plaintiff, we are not convinced that they are supportive of its claim. *Converse Rubber Company v. United States*, 69 Cust.Ct. 55, C.D. 4374 (1972) held that the imported merchandise was shoe machinery based on a finding of fact that the multiple stations [ten in all] were particularly suitable for manufacturing the numerous sizes of shoe soles required by the industry, and on a finding that efforts to sell the machines to manufacturers of other plastic articles were unsuccessful in that it was not economical to produce these items on a ten-station machine costing $200,000.*

In *Theo. H. Davies & Co. v. United States*, 70 Cust.Ct. 5, C.D. 4399 (1973), the court considered whether certain crawler-mounted machinery used in harvesting sugar cane was properly classifiable as harvesting machinery. In determining that it was, in fact, a member of a special class or kind of machinery, the court made the following comparison with shoe machinery:

The situation here is analogous to that involved in recent shoe machinery cases where the question was whether the imported merchandise belonged to a broad class, such as slush molding or injection molding machines, or a narrower class comprising a particular kind of slush molding or injecting molding machine, chiefly used as shoe machinery. *E. Dillingham, Inc. v. United States*, 65 Cust.Ct. 224, C.D. 4082 (1970); *Converse Rubber Company v. United States*, 65 Cust.Ct. 453, C.D. 4121 (1970), *decision on rehearing* 69 Cust.Ct. 55, C.D. 4374 (1972).

In the *Dillingham* case the issue was whether molds for use with a particular slush molding machine were parts of a class or kind of machinery chiefly used for producing shoes. The court held that to establish that the Bata monoplax unit (the machine with which the molds were

---

merchandise in *Converse Rubber* held to be shoe machinery.

used) belonged to a class of merchandise chiefly used as shoe machinery, it would have to be shown that there was a kind of slush molding machinery which was chiefly used as shoe machinery and that the Bata monoplax unit belonged to that class. Since such evidence was lacking, the protest was overruled.

Analogously, plaintiff should have shown that there was a kind of injection molding machinery which was chiefly used as shoe machinery and that the MT 10 and the SS 200 belong to that class.

In *E. Dillingham, Inc. v. United States*, 54 CCPA 121, C.A.D. 922 (1967), the court held that plaintiff had failed to establish chief use of the imported merchandise, molding machines, as shoe machinery, stating:

> For all we know, the imported machinery may be used in any manufacturing operation where molding is one step. Cf. *Louis G. Freeman Co. v. United States*, 58 Treas.Dec. 1060, Abstract 13580, where certain "leather-splitting machines" were deprived of the benefit of free entry as shoe machinery since the machines could be used in any factory where splitting [*sic*] leather was needed for any purpose, including the manufacture of shoes.
>
> The fact that the imported article is being used in the manufacture of shoes is insufficient to establish chief use.

In *Gleeson v. United States*, 432 F.2d 1403, 58 CCPA 17, 22, C.A.D. 998 (1970), the court considered slush molding machinery claimed by the importer to be shoe machinery. In concluding that plaintiff had failed to establish chief use as shoe machinery, the court stated:

> [W]e find the testimony regarding the use of the particular molding machine appellant imported insufficient proof of chief use. Chief use envisions use by users, as a whole, of the type of commodity involved, and not merely individual use of the particular shipment in question. *United States v. Spreckles Creameries, Inc.*, 17 CCPA 400, 402, T.D. 43835 (1930).

The legislative history of the term "shoe machinery" as used in the Tariff Act of 1930 was considered at length in *United States v. Hudson Shipping Co.*, 49 CCPA 92, 95–96, C.A.D. 802 (1962). The court concluded:

> Congress, in using the term "shoe machinery" in paragraph 1643 of the Tariff Act of 1930, having before it the foregoing Summaries of Tariff Information, appears to us to have intended to cover specialized machines particularly adapted for and used in the manufacture of shoes . . . .

The Tariff Classification Study of 1960 did not evidence any intent on the part of Congress except to continue the duty-free status of shoe machinery and parts thereof [see page 275 of schedule 6].

■ The Summaries of Trade and Tariff Information, although not conclusive as legislative history, can be used as a guide in determining Congressional intent. Shoe machinery is discussed in Schedule 6, Volume 10, pp. 23–27 (1969). Excluded from classification as shoe machinery is "machinery for molding or forming rubber or plastics (other than complete footwear), item 678.35," and "shoe machinery molds for forming rubber or plastic materials, item 680.11" (p. 23). Additionally, in the discussion on U.S. imports, the Summaries state:

> The bulk of the imports are classified under item 678.10 and consist of such articles as plastic-injection machines which produce a complete shoe . . . . Plastic-injection machines which mold a complete shoe account for a significant share of the value of imports, although the number of such machines imported is small. [P. 26.]

Thus, it appears that Congressional intent to exclude general purpose plastic molding machines from classification as shoe machinery unless a complete shoe or other footwear is molded is expressed in the Summaries.

### The Molds

■ The record reflects, and plaintiff has submitted ample proof, that the molds are an integral part of the imported molding

machinery. However, failure to show chief use of the machine, in legal contemplation, as shoe machinery controls the classification of the molds. In *W. A. Gleeson v. United States, supra*, the court considered certain rebuilt equipment for slush molding plastic footwear and the molds to be used with these machines. In deciding that the plaintiff had failed to carry the burden of proving that the chief use of the slush molding machines was as shoe machinery [see this opinion, *supra*], the court also held that failure to prove such chief use requires that the molds could not be classified as shoe machinery molds.

While at first blush it would appear that this results in an anomalous ruling wherein molds that are actually used only in the manufacture of shoe parts are not classifiable as shoe machinery molds, but rather as other molds used for rubber or plastics materials, this result is not as incongruous as it might at first appear to be.

The clear words of the statute and judicial interpretation of principles of chief use require that classification under item 680.11 as shoe *machinery* molds be predicated on the merchandise being chiefly used with shoe machinery. In addition to our finding that the imported MT 10 and SS 200 were not, for tariff schedule purposes, shoe machinery, there was testimony to the effect that the molds imported for use with the MT 10 were also used on other general purpose plastic molding machines such as the Battenfeld, and could be used with the Reed-Prentice and Van Dorn horizontal injection molding machines which are also general purpose injection molding machines used to mold a variety of articles other than shoe parts.

We therefore affirm the classification of the molds as "other" molds under item 680.-12 or item 680.15, TSUS.

## CONCLUSION

Plaintiff having failed to establish that the chief use of the imported merchandise was as shoe machinery and as shoe machinery molds, the presumption of correctness attaching to the classification by customs was not overcome and these consolidated actions are dismissed.

Judgment will enter accordingly.