The TORRINGTON
COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 89–06–00313.

United States Court of
International Trade.

Aug. 3, 1990.

---

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart and Wesley K. Caine, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson (Diane M. McDevitt, Atty.–Advisor, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel), for defendant.

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), brings this action to challenge the final determination of ITA in the antidumping investigation of antifriction bearings from Romania. *Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania*, 54 Fed.Reg. 19,109 (May 3, 1989). Pursuant to Rule 56.1(a) of the Rules of this Court, plaintiff seeks partial judgment upon the agency record regarding that part of ITA's determination which described five separate classes or kinds of

antifriction bearings. In its petition requesting the imposition of antidumping duties, Torrington alleged there was only one class or kind of merchandise, that is, all antifriction bearings (except for tapered roller bearings). Plaintiff claims Commerce does not have the authority to modify the petition's description of "class or kind," but even if it did, its modification is not supported by substantial evidence in the record.

### Background

Plaintiff, a domestic producer of antifriction bearings, filed a petition on March 31, 1988 requesting that the Department of Commerce impose antidumping duties on all imports of antifriction bearings, except for tapered roller bearings, from a number of countries, including Romania. *Plaintiff's Petition, General Administrative Record* ("AR") (Public) Doc. 1. The petition described the "class or kind" of merchandise for which antidumping duties were sought as: "all ground antifriction bearings and all parts thereof both finished and unfinished with the exception of tapered roller bearings." *Id.* at 13. The petition went on to describe a number of different types of bearings, all of which were included in the petition's defined scope. These included

ball bearings, cylindrical roller bearings, spherical roller bearings, spherical plain bearings, needle roller bearings, thrust bearings, tappet bearings, and all mounted bearings such as set screw housed units, bushings, pillow block units, flange, cartridge and take-up units and parts including balls, rollers, cages or retainers, cups, shields and seals. *Id.*

Commerce subsequently initiated antidumping investigations of the imported bearings. Shortly thereafter, several other manufacturers of antifriction bearings protested the inclusion of many different types of bearings in the same investigation. They urged Commerce to divide the investigations into several classes or kinds of merchandise. The SKF Group suggested that the bearings be divided into ten classes or kinds. AR (Pub.) Doc. 65. Koyo Seiko, a Japanese producer of antifriction

bearings, proposed eight different classes or kinds. In essence, their complaint was that Torrington had "lump[ed] together a number of distinct categories of bearings under the omnibus rubric of 'antifriction bearings.'" AR (Pub.) Doc. 24 at 2.

Commerce then released a memorandum in which it explained that the merchandise under investigation actually comprised five different classes or kinds. *ITA Class or Kind Memorandum* (July 13, 1988), AR (Pub.) Doc. 102. These five classes or kinds were: (1) ball bearings; (2) spherical roller bearings; (3) cylindrical roller bearings; (4) needle roller bearings; and, (5) plain bearings. *Id.* On July 22, 1988, Commerce notified Torrington that further evidence of sales of the several classes or kinds of bearings in the United States at less than fair value ("LTFV") was needed for the investigations to continue. AR (Pub.) Doc. 114.

Additional evidence of LTFV sales submitted by Torrington was deemed inadequate and Commerce informed Torrington of this on August 22, 1988. AR (Pub.) Doc. 164. ITA then rescinded the investigations of cylindrical roller bearings, needle roller bearings, and plain bearings from Romania. *Partial Rescission of Initiation of Antidumping Investigations and Dismissal of Petitions; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania, Singapore, and Thailand,* 53 Fed.Reg. 39,327 (October 6, 1988). However, the investigations of ball bearings and spherical roller bearings from Romania continued. The final determination in the antifriction bearings investigation was published on May 3, 1989. 54 Fed.Reg. 19,109.

Torrington now argues that ITA had no authority to divide antifriction bearings into five different classes or kinds of merchandise. *Memorandum in Support of Plaintiff's Motion for Partial Judgment upon an Agency Record* ("Plaintiff's Mem-

orandum") at 11. Further, if ITA does have that power, then its finding of five classes or kinds is based on an "impermissibly narrow construction" of the concept of class or kind. *Id.* at 19. Also, plaintiff alleges that ITA's determination is not supported by substantial evidence in the administrative record. Finally, Torrington contests the determination on the grounds that it is not consistent with prior determinations.

### Discussion

I. Commerce's Authority to Modify the Class or Kind of Merchandise as Described in the Petition

■ Plaintiff's first argument is that once a petition which satisfies the requirements of 19 U.S.C. § 1673a(b) is filed, ITA lacks the "authority to modify 'class or kind' descriptions given by petitioners in their petitions." *Plaintiff's Memorandum* at 12.[1] Plaintiff seeks support for this contention in the antidumping laws of the United States, which require ITA to investigate "to determine whether the class or kind of merchandise described in the petition is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673a(c)(2) (1988).

Torrington stresses that the statute calls for Commerce to give deference to the definition of class or kind found in the petition. Commerce agrees that its investigation must encompass the class or kind of merchandise found in the petition, "provided that the petition satisfies the initiation requirements for each class or kind of merchandise 'described in the petition.'" *Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Judgment upon the Agency Record* ("Defendant's Memorandum") at 17–18.[2] Indeed, the statute contains no provision prohibiting Commerce from distinguishing between two classes or kinds of merchandise when the petition improperly fails to do so.

---

1. 19 U.S.C. § 1673a(b) (1988) requires that
    An antidumping proceeding shall be commenced whenever an interested party ... files a petition with the administering authority, on behalf of an industry which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and
    which is accompanied by information reasonably available to the petitioner supporting those allegations.

2. The initiation requirements include the provisions of § 1673a, *supra,* as well as the regulations found in 19 CFR § 353.36 (1988).

The petitioner's description of class or kind is awarded some deference inasmuch as the petitioner often will call Commerce's attention to an otherwise overlooked potential dumping problem. However, where a petition is not sufficient on its face or where a particular product mentioned in the petition does not satisfy the initiation requirements, Commerce need not commence an investigation. 19 U.S.C. § 1673a(c).

This court recently affirmed the description of the class or kind of merchandise as interpreted by Commerce, even though it differed from that provided by the petition. *Mitsubishi Elec. Corp. v. United States*, 12 CIT ——, ——, 700 F.Supp. 538, 555–56 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990). In *Mitsubishi*, the petitioner defined the class or kind of merchandise as "all cellular mobile telephones manufactured in Japan, plus all mobile transceivers or kits of components and subassemblies manufactured in Japan for use in final assembly of cellular mobile telephones." *Id.* at ——, 700 F.Supp. at 541. However, ITA defined the scope as "including subassemblies in general, not restricting the scope to subassemblies sold only in kits or collections." *Id.* at ——, 700 F.Supp. at 543. In upholding ITA's expansion of the scope of the investigation, this court held that ITA "has the authority to define and/or clarify what constitutes the subject merchandise to be investigated as set forth in the petition." *Id.* at ——, 700 F.Supp. at 555.[3]

In *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd*, 69 CCPA 61, 669 F.2d 692

(1982), this court considered a petition concerning imported typewriters. There, the plaintiff, a foreign maker of typewriters, believed its product was not within the scope of the antidumping duty order. *Id.* at 87, 507 F.Supp. at 1014. However, the court held that "even if plaintiff believed itself to be an 'orange' among 'apples', so long as the Department of Commerce and the ITC were considering it to belong to a certain class it remained so for the purpose of the proceedings." *Id.*[4] This discretion was reinforced by the court when it stated that the "agency, at the proper time, can define the class in its terms." *Id.*

Furthermore, in affirming *Mitsubishi* earlier this year, our appellate court held that "the responsibility to determine the proper scope of the investigation and of the antidumping order ... is that of the [ITA], not of the complainant before the agency." 898 F.2d at 1582.[5] But while ITA has the discretion to modify the class or kind of merchandise which is described in the petition, that "discretion must be exercised in light of all the facts before the Administration and must reflect that agency's judgment regarding the scope and form of an order that will best effectuate the purpose of the antidumping laws and the violation found." *Id.* at 1583.

Torrington submits two additional arguments in support of its contention that Commerce has no authority to subdivide the class or kind described in the petition: (1) that the antidumping laws of the United States are "remedial in nature," and therefore should be construed broadly, and (2)

---

**3.** Though in *Mitsubishi* ITA *expanded* the scope of the investigation whereas here it has *narrowed* the scope, the principle is the same. Once ITA's discretion to modify the class or kind description is established, it does not matter whether the modification expands or narrows the scope, provided the change is supported by substantial evidence in the administrative record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

**4.** Plaintiff also cites *Royal Business Machines*, acknowledging that ITA "might" have the power to help define class or kind, but only in order to expand the petition's coverage. *Plaintiff's Memorandum* at 14. As stated in note 3 above, that

distinction is not a valid one. ITA's authority to modify the class or kind, where necessary, is not limited to expansion of the petition; ITA also may narrow the scope.

**5.** Clearly, ITA maintains a certain amount of discretion in ascertaining the proper scope of an antidumping duty *order*. *Mitsubishi*, 898 F.2d at 1582–83; *Smith–Corona Group v. United States*, 713 F.2d 1568, 1582 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). This discretion must then also apply early on in the investigation, to the determination of whether the *petition* properly distinguished between different classes or kinds of goods.

that Commerce's modification is a departure from its prior practice.

As to the first, Torrington states that remedial statutes should be applied liberally so they may better achieve the desired results, that is, "relief from unfair import price competition." *Plaintiff's Memorandum* at 14. A broad application does not mean, however, that antidumping duty orders should be issued with abandon. Petitioner still must meet the initiation requirements of the statute in order for Commerce to commence an investigation.

Finally, Torrington argues that, since 1980, ITA has "almost invariably followed the 'class or kind' descriptions provided by petitioners in their petitions." *Id.* at 17. Plaintiff admits, however, that there are at least two cases where ITA narrowed the class or kind described in the petition, but dismisses them as "anomalies." *Id.* at 18.[6] Though Commerce does not exercise this authority often, its right to do so is not limited by the frequency of its use. The argument that Commerce may not modify the petition's class or kind because it rarely has done so does not persuade the Court. Accordingly, the Court finds that Commerce possesses the authority to subdivide the class or kind description submitted by petitioners in the petition, if ITA discovers that more than one class or kind of merchandise has been merged into a single class or kind.

## II. Commerce's Construction of "Class or Kind"

■ Torrington's next argument is that even if Commerce does have the authority to modify the petition's class or kind, ITA implemented an "impermissibly narrow construction of the statutory concept 'class or kind.'" *Plaintiff's Memorandum* at 19. Plaintiff claims that the statute and caselaw require a more liberal interpretation of the term. Commerce contends that compelling ITA to use a "broad" interpretation of class or kind would severely restrict its discretion in determining the scope of an antidumping investigation. *Defendant's Memorandum* at 30.

Plaintiff cites several Customs cases which allude to the general character of the term "class or kind," as used in the classification and appraisement statutes. *See B. & K. Instruments, Inc. v. United States,* 82 Cust.Ct. 219, C.D. 4803 (1979); *Pistorino & Co. v. United States,* 81 Cust.Ct. 106, C.D. 4774, 461 F.Supp. 337 (1978); *The Golding–Keene Co. v. United States,* 44 Cust.Ct. 169, C.D. 2172, 183 F.Supp. 947 (1960), *aff'd,* 48 CCPA 66, C.A.D. 766 (1961). While these cases are helpful inasmuch as they explain Customs' view of the proper interpretation of class or kind, they are not germane to the issue of the proper construction of the phrase by ITA.

It is well settled that a tariff classification by the Customs Service does not govern an antidumping determination regarding class or kind. *Mitsubishi,* 12 CIT at —, 700 F.Supp. at 553–54; *Roquette Freres v. United States,* 7 CIT 88, 95, 583 F.Supp. 599, 605 (1984); *Diversified Products Corp. v. United States,* 6 CIT 155, 159, 572 F.Supp. 883, 887 (1983); *Royal Business Machines,* 1 CIT at 87, 507 F.Supp. at 1014. It is the responsibility of ITA to interpret the term class or kind in such a way as to comply with the mandates of the antidumping laws, not the classification statutes. A product's tariff classification is merely of peripheral interest to suggest the general nature of a good.[7]

---

6. The two cases where plaintiff acknowledges that Commerce narrowed the petition's scope are *Cyanuric Acid and Its Chlorinated Derivatives from Japan,* 49 Fed.Reg. 17,825 (Apr. 25, 1984) and *Final Determinations of Sales at Less Than Fair Value; Hot–Rolled Carbon Steel Plate and Hot–Rolled Carbon Steel Sheet from Brazil,* 49 Fed.Reg. 3,102 (January 25, 1984). However, Torrington states that the modification by Commerce was not challenged in either instance, since antidumping duty orders were upheld against all the classes or kinds of merchandise in both cases. *Plaintiff's Memorandum* at 17–18.

7. This court has stated that antidumping determinations "may properly result in the creation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Service." *Royal Business Machines,* 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18.

Plaintiff also cites *Diversified Products*, wherein the court enumerated the criteria used to determine what merchandise should be included in the class or kind described by an antidumping duty order. The criteria include: "the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost." *Diversified Products*, 6 CIT at 162, 572 F.Supp. at 889. This standard has been used by the ITA repeatedly, and has been affirmed by this court. *Mitsubishi, supra*, 12 CIT at ——, 700 F.Supp. at 547.

Torrington concludes that since the *Diversified* court referred to "general" characteristics and "ultimate" use, it intended a broad interpretation of class or kind. *Plaintiff's Memorandum* at 19. The Court can see no reason to adopt such a conclusion. The terms in themselves serve only to guide Commerce's analysis. An antidumping determination must depend on the particular facts of each case, and a sweeping directive that ITA must "broadly" apply the term class or kind would improperly divert Commerce's discretion to the petitioner. Furthermore, the statutes and caselaw require neither a "broad" nor a "narrow" interpretation of class or kind, only one that is supported by substantial evidence and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). The Court thus holds that ITA's interpretation of class or kind was reasonable and in accordance with law.

III. Substantial Evidence

■ We now reach the issue of whether ITA's determination was supported by substantial evidence in the administrative record. The Court must reverse Commerce's determination if it finds that the determination is not supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see also Gold Star Co. v. United States*, 12 CIT ——, ——, 692 F.Supp. 1382, 1383–84 (1988), *aff'd sub nom. Samsung Elec. Co. v. United States*, 873 F.2d 1427 (Fed.Cir.1989).

In determining whether to affirm an antidumping determination by Commerce, the Court "may not substitute its judgment for that of [ITA] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice'" had it decided the issue itself. *Mitsubishi*, 12 CIT at ——, 700 F.Supp. at 558; *see also United States v. Zenith Radio Corp.*, 64 CCPA 130, C.A.D. 1195, 562 F.2d 1209 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *SCM Corp. v. United States*, 4 CIT 7, 10, 544 F.Supp. 194, 197 (1982).

Moreover, a determination by Commerce will not be overturned merely because the plaintiff "is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination." *Hercules, Inc. v. United States*, 11 CIT 710, 755, 673 F.Supp. 454, 490 (1987). Plaintiff's evidence must be enough to convince the Court that a reasonable mind would not have found ITA's evidence sufficient to support its conclusion.

Commerce's decision to subdivide the petition's class or kind description into five classes or kinds was based on its evaluation of the antifriction bearings in question within the structure of the *Diversified Products* criteria. Those criteria are: (1) general physical characteristics; (2) the expectations of the ultimate purchasers; (3) the channels of trade in which the merchandise moves; (4) the ultimate use of the product; and, (5) cost. *Diversified Products*, 6 CIT at 162, 572 F.Supp. at 889.[8] If the products described by the petition do not match these criteria, Commerce has the

---

8. In this case, the Department used "the manner of advertising and display" instead of cost. *Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 18,992, 18,999 (May 3, 1989).

authority to investigate the products separately.

A. General Physical Characteristics

There seems to be no dispute that all antifriction bearings possess a number of similar characteristics. These include an outer race, an inner race, balls or roller elements, and a separator or cage which keeps the balls or rollers equally distributed around the races. *Plaintiff's Memorandum* at 31–32; 54 Fed.Reg. at 18,999.

However, ITA determined that these general similarities are not sufficient to determine the character of a bearing, which ITA maintains is established by "the shape of the rolling element ... [or] the sliding contact surfaces." 54 Fed.Reg. at 18,999. ITA found that the rolling element or sliding surface "determined or limited the [bearings'] key functional capabilities (*e.g.*, load and speed)," which in turn established the limits of the bearings' ultimate use and the expectations of the purchasers. *Id.* Commerce stated in the final determination that "there is no other physical characteristic among these bearings more fundamental than the shape of the most essential component, the rolling element." *Id.* at 19,002.[9] As a result, Commerce decided to divide the bearings on the basis of their rolling elements, even though there are other differences among the various types of bearings.[10]

Subsequently, Commerce found that five different classes or kinds of antifriction bearings existed. They are: (1) ball bearings, (2) spherical roller bearings, (3) cylindrical roller bearings, (4) needle roller bearings, and (5) spherical plain bearings. *Defendant's Memorandum* at 36–38.

Commerce appears to have based its rolling elements distinctions primarily on the Navair Manual, a technical manual used by the Department of Defense for the maintenance of antifriction bearings. The manual contains descriptions of bearings under the headings: "rolling bearings" and "sliding/plain bearings." Both of these categories are divided further. Rolling bearings are separated into ball bearings, roller bearings and aircraft control and pulley bearings. *Navair Manual* at 3–4. Sliding/plain bearings encompass straight plain bearings, flanged plain bearings and spherical bearings. *Id.* at 4. Each of these categories is further subdivided, and some of the subdivisions are separated yet again. Thus, the Navair Manual distinguishes among over forty types of bearings. Each type is then described according to its physical characteristics and proper use.[11]

Torrington states that the Navair Manual actually supports a distinction between only two types of bearings: rolling and sliding/plain, because those are the two principal headings in the document. *Plaintiff's Memorandum* at 33. Furthermore, plaintiff asserts that the "component parts" discussion in the manual lends itself to the conclusion that there is only one class or kind of bearing. The Court disagrees on both points.

First, though the document contains two "general" types of bearings, that does not necessarily indicate that the general characteristics of antifriction bearings for *class*

9. Plain bearings, however, do not contain a rolling element. They have an outer and inner ring which slide against each other. *Navair Manual, Defendant's Memorandum,* Attachment IV at 2–18.

10. Other distinctions found by ITA include differences in "size, precision level, and applications." 54 Fed.Reg. at 19,002. The agency found these differences less significant than the rolling element, or in the case of the spherical plain bearings, the sliding surface shape. Additionally, ITA stated that if it had distinguished on the basis of size, precision levels or applications, the "subdivision of scope ... would have led to numerous classes or kinds and absurd results." *Id.*

11. Ball bearings have ball-shaped rolling elements and grooved raceways. Cylindrical roller bearings contain cylinders as rolling elements, and cylindrically shaped raceways. Needle roller bearings also have a cylindrical roller element but have a higher length-to-diameter ratio than cylindrical roller bearings. Spherical roller bearings have a raceway which is part of a sphere, "the center of which is the center of the bearing." Lastly, spherical *plain* bearings have no rolling element, but rather contain a sliding surface which allows the outer ring to slide over the inner ring. *See Navair Manual generally.*

*or kind* purposes are properly identified by only those categories. That is an issue for ITA to decide based on all of the evidence. Though the term "general" means broad, it need not refer only to the characteristics common to *all* bearings where another trait also is essential to the product's integrity. Hence, the Court finds that Commerce's determination that the rolling element (or sliding surface shape) is a general physical characteristic is entirely reasonable and supported by substantial evidence.

Second, the component parts discussion of the Navair Manual describes various parts of bearings, particularly the separator or cage (referred to in the manual as the "retainer"). *Navair Manual* at 20–23. It refers to various types of retainers as well as other components used in other bearings. The Court finds that this discussion does not significantly contribute to the debate, and if anything, stresses the differences among bearings.

Other evidence in the record includes the factual data regarding bearings compiled by the staff of the Office of Industrial Resource Administration (OIRA) and the final OIRA report entitled "The Effect of Imports of Anti–Friction Bearings on the National Security." *Plaintiff's Memorandum* at Attachment 5. Both the draft report of factual data and the final report classify bearings "according to the type of rolling element they contain as well as by their size and precision." *OIRA Final Report* at II–16. The final report refers to four general types of bearings: ball bearings, roller bearings, unground bearings and plain bearings. *Id.*[12]

Torrington also submitted a "Factory Tours Video" containing footage of its factories and interviews with various Torrington engineers and managers. While the video shows how machines in various factories can produce various types of bearings, it does not clearly indicate that the physical characteristics of all bearings are essentially the same. Indeed, the physical differences among the different types of bear-

ings were glaringly apparent from the video as each of the tour guides pointed out assorted bearings at the factories.

In addition, Commerce received submissions from other manufacturers of antifriction bearings, both foreign and domestic. These submissions explained that there are important differences among bearings. Furthermore, they stressed that there is a low degree of interchangeability among the numerous types of bearings.

In a letter to ITA, counsel for NMB Singapore proposed that Commerce find at least two classes or kinds of bearings: ball bearings and roller bearings. *Letter from NMB Singapore to ITA* (June 14, 1988), AR (Pub.) Doc. 74. SKF Group, another producer of bearings, suggested ten different classes or kinds. *Letter from SKF Group to ITA* (June 8, 1988), AR (Pub.) Doc. 65. And Koyo Seiko, a Japanese maker of bearings, stated to ITA that there are at least eight separate classes or kinds of antifriction bearings. *Letter from Koyo Seiko to ITA* (May 11, 1988), AR (Pub.) Doc. 24. Thus, ITA received evidence supporting both extremes, from one class or kind to ten different classes or kinds. In finding five classes or kinds, ITA appears to have reached some middle ground.

The evidence in the record supports the conclusion that the general physical characteristics of the various antifriction bearings are significantly different. The essential nature of a bearing is indicated not merely by the presence of an outer race, inner race, rolling element and separator, but also by the distinctive type of rolling element that it contains. Though most of the accounts in the record differentiated among ball bearings, roller bearings and plain bearings, ITA chose to subdivide roller bearings further, into spherical roller bearings, cylindrical roller bearings and needle roller bearings. While the Court is not entirely convinced that roller bearings *necessarily* ought to be subdivided, ITA's decision to do so is not clearly wrong and is in fact a reasonable conclusion which is

---

**12.** Unground bearings are not part of this investigation. However, ball bearings, roller bearings and plain bearings are.

supported by substantial evidence in the record.

### B. Ultimate Use

The second criteria for determining class or kind is the ultimate use of the product. *Diversified Products*, 6 CIT at 162, 572 F.Supp. at 889. If the bearings in question all have the same ultimate use, that is evidence toward a finding that they are all of the same class or kind. Torrington asserts that all bearings do have the same ultimate function, that is, "to reduce friction between moving parts." *Plaintiff's Memorandum* at 40. Furthermore, plaintiff claims that "different types of antifriction bearings are often *interchangeable*, at least in the design stage of their host products." *Id.* at 41 (emphasis in original). Commerce counters that the mere fact that there are so many different types of bearings indicates that they do not all have the same ultimate use. 54 Fed.Reg. at 19,003.

Commerce's evidence in support of its contention that all bearings are not fit for the same ultimate use includes the ITC Preliminary Determination, ITC Competitive Assessment Study, the OIRA Draft Summary Report, and the Navair Manual. The evidence reveals that different types of bearings have different load and speed capabilities. Since these capabilities admittedly are among "the most important variables in bearing selection," variations in these capabilities dictate different uses for different bearings. *Plaintiff's Petition* at 14.

The different uses for various bearings can be summarized as follows: ball bearings are used where high speed, low load capacity is needed. This is because they generate less friction than other bearings. USITC Pub. 2083 (May 1988) ("ITC Preliminary Determination") at 17, A–4. Typical uses for ball bearings include automotive products and various home appliances. USITC Pub. 1797 (January 1986) ("ITC Competitive Assessment Study") at 10. Spherical roller bearings have heavy load but moderate speed capability. *ITC Preliminary Determination* at 17. These bearings generate more friction than ball bearings and are capable of correcting mi-

salignment, making them useful in deep-well pump motors or heavy equipment, such as grinding or crushing machines. *ITC Competitive Assessment Study* at 10.

Cylindrical roller bearings do not correct for misalignment and have moderate to high load and speed capability. *ITC Preliminary Determination* at A–7. These bearings are often used in metal rolling mills. *ITC Competitive Assessment Study* at 10. Needle roller bearings have high load and speed capacity. *ITC Preliminary Determination* at A–7. They are long and thin and thus can be used in areas where there is little space, such as in automobiles and home appliances. *ITC Preliminary Determination* at A–7; *ITC Competitive Assessment Study* at 11. Finally, spherical plain bearings have no rolling element but rather have a sliding surface so that the outer race passes over the inner race. Because of this unique shape, spherical plain bearings can carry heavy loads but only at low speeds. *ITC Preliminary Determination* at A–7. Plain bearings are typically used in hydraulic cylinders and heavy construction equipment. *Id.*

Plaintiff states that antifriction bearings are frequently interchangeable at the design stage, and that their ultimate use (to reduce friction) is the same. *Plaintiff's Memorandum* at 45. While the evidence indicates that in some cases it is possible to substitute one bearing for another at the original equipment manufacturer (OEM) stage, that substitution does in fact change the specifications of the product. Torrington's claim that all bearings reduce friction and therefore have the same ultimate use is a simplistic and unpersuasive argument. Clearly, different bearings exist because they have various uses. The industry is a vast and diverse one, and the different types of bearings serve the disparate needs of the modern mechanized world.

### C. Customer Expectations

The next prong of the *Diversified Products* test is the expectation of the ultimate purchasers. 6 CIT at 162, 572 F.Supp. at 889. This part of the criteria is closely related to ultimate use. The expectations of the ultimate purchasers of antifriction

bearings differ depending on the needs of the customer and the ability of the particular bearing to perform a given task. For example, a customer who needs bearings that can handle heavy loads, but who is not concerned with speed, would be interested in a plain bearing. Conversely, a purchaser who expects a bearing to perform at high speeds, but with a light load, would find a ball bearing more useful.

Again, Torrington's argument that "[a]ll customers expect the bearings they purchase will function to reduce friction between moving parts" is simplistic and, frankly, unhelpful.[13] *Plaintiff's Memorandum* at 45. Customer expectations do vary depending on the needs of the customer and the ability of a particular bearing to perform a given task.

### D. Other Criteria

*Diversified Products* referred to two other criteria: "the channels of trade in which the merchandise moves, ... and cost." 6 CIT at 162, 572 F.Supp. at 889.[14] Commerce also included another criteria, manner of advertising, in assessing class or kind. The issues of channels of trade and manner of advertising do not appear to be in dispute.

ITA admits that the "evidence with respect to these criteria is inconclusive." 54 Fed.Reg. at 19,003. There is evidence that all the classes or kinds of bearings discussed herein "move through the same channels of distribution." *Plaintiff's Memorandum* at 47. Additionally, catalogs appear to be arranged by applications rather than by types of bearings.

Though Commerce admits there is no irrefutable evidence either that bearings with different rolling elements move through different channels of trade or that they are advertised separately, it argues that the other evidence supporting its class or kind distinctions outweighs these inconclusive findings. *Defendant's Memorandum* at 49. The Court agrees.

The evidence in the record is substantial and conclusive that the classes or kinds of bearings found by ITA possess significantly different physical characteristics. Furthermore, the ultimate uses of the bearings and customer expectations for them vary depending on the type of rolling element in the bearings. Accordingly, the Court holds that the determination by Commerce that the merchandise in issue is properly segmented into five classes or kinds is supported by substantial evidence in the administrative record.

### IV. Consistency With Prior Determinations

Plaintiff also submits that Commerce's determination was not in accordance with law because it was inconsistent with prior determinations. *Plaintiff's Memorandum* at 51.

▮ It is a principle of administrative law that an "agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n,* 659 F.2d 488, 506 (5th Cir.1981); *see also Borden, Inc. v. Federal Energy Regulatory Comm'n,* 855 F.2d 254, 261 (5th Cir.1988), *reh. denied en banc,* 860 F.2d 437 (5th Cir.1988); *Greater Boston Television Corp. v. F.C.C.,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). However, an agency is "not bound to rigid adherence to precedent" where the public interest and the pursuit of justice require deviation from prior holdings. *McHenry v. Bond,* 668 F.2d 1185, 1192 (11th Cir.1982).

**13.** Torrington suggests that Commerce has approached the issue of class or kind too narrowly by focusing too closely on the physical differences among the many types of bearings. Plaintiff suggests an analogy to automobile tires, and states that ITA's reasoning would place 14 inch tires in a separate class or kind than 15 inch tires. *Plaintiff's Memorandum* at 46. The Court finds that analogy inapposite. A more appropriate analogy would be to the high performance tires one might find on a Lamborghini versus the practical whitewall tires more likely found on an Oldsmobile.

**14.** Commerce has not addressed the issue of cost, nor has Torrington raised it. Hence, the Court will not address it either.

■ In this case, Torrington argues that ITA deviated from prior holdings in that articles which were "substantially more different in numerous respects than are the types of bearings in question here" were included within a single class or kind. *Plaintiff's Memorandum* at 52. Torrington cites several instances where ITA found one class or kind of merchandise, and argues that these cases created a precedent for Commerce to apply the *Diversified Products* criteria broadly. *Id.* at 52–56.[15]

The Court concludes that plaintiff's contentions are without merit for two reasons. First, the determination in the present case does not suggest a departure from previous ITA policy. Therefore, no "reason or explanation" for a departure from precedent is warranted. There is no credible evidence on the record that Commerce once had a *policy* of "broadly" applying the class or kind criteria, and has now "narrowly" applied them. Nor is there evidence that ITA precedent calls for Commerce to blindly accept all of the petition's pronouncements, as Torrington would have Commerce do. Precedent demands that ITA apply the *Diversified Products* criteria in a manner which is consistent with the mandates of the antidumping laws and, as discussed above, ITA has done so. Hence, Commerce's determination in this action is not inconsistent with precedent.

Second, the application of the *Diversified Products* criteria in a uniform and consistent manner does not guarantee the same result in every situation. All antidumping determinations are dependent on the specific facts of each case and, while a petition may propound a particular path, ITA's role in evaluating a petition is not to be a rubber stamp of the petitioner's assertions.

Commerce maintains "inherent power to establish the parameters of the investigation so as to carry out its mandate to administer the law effectively and in accordance with its intent." *Mitsubishi,* 700

F.Supp. at 547. Thus, if Commerce were required to apply the *Diversified Products* guidelines in such a manner as to achieve identical results for dissimilar products, the purpose of the antidumping laws would be contravened. The fact that the use of the criteria in one case resulted in the finding of one class or kind whereas in another it resulted in several classes or kinds is, without more, of no consequence.

Therefore, the Court holds that Commerce's determination is not contrary to law by reason of inconsistency with prior determinations because it is not inconsistent with ITA precedent. Furthermore, all determinations cannot be expected to yield similar results as each investigation involves a discrete product. When, as here, the determination is not contrary to law and is supported by substantial evidence in the administrative record, that determination must stand.

### Conclusion

Accordingly, the Court holds that, as a matter of law, Commerce possesses the authority to modify the definition of class or kind found in the petition if Commerce determines that the petition's description actually contains more than one class or kind of merchandise.

Furthermore, the Court finds that the determination by Commerce in the present action is supported by substantial evidence in the administrative record and is otherwise in accordance with law, and is, therefore, affirmed in all respects.

### JUDGMENT

Plaintiff having moved this Court pursuant to Rule 56.1 of the Rules of this Court for partial summary judgment as to Count 1 of its Complaint, the defendant having opposed same, and the Court after due deliberation, having rendered a decision

---

15. The cases cited by Torrington involved investigations of, *inter alia,* fire-protection equipment, typewriters, microdisks, electric motors, iron construction castings, and steel wire nails. *See* 49 Fed.Reg. 47,066 (Nov. 30, 1984); 48 Fed.

Reg. 7,768 (Feb. 24, 1983); 54 Fed.Reg. 6,433 (Feb. 10, 1989); 45 Fed.Reg. 73,723 (Nov. 6, 1980); 51 Fed.Reg. 2,412 (Jan. 16, 1986); 47 Fed.Reg. 27,392 (June 24, 1982).

herein; now, therefore, in accordance with said decision, it is hereby

ORDERED that plaintiff's motion for partial judgment upon the agency record as to Count 1 of plaintiff's Complaint is denied, and the determination by the International Trade Administration is affirmed in all respects. It is further

ORDERED that, pursuant to Rule 54(b) of the Rules of this Court, this is a final judgment and that there is no just reason for delay in the entry of an actionable final judgment.