DIVERSIFIED PRODUCTS
CORPORATION, Plaintiff,

v.

UNITED STATES, Defendant,

and

Stewart-Warner Corporation, Intervenor.

Court No. 82–7–01065.

United States Court of International
Trade.

Sept. 27, 1983.

Lamb & Lerch, Richard J. Kaplan, New York City, of counsel (Sidney H. Kuflik, New York City, on briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Commercial Lit. Branch, Washington, D.C., Robert T. Seeley, Intern. Trade Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel (Francis J. Sailer, Washington, D.C., on briefs), for defendant.

Eugene L. Stewart, Terence P. Stewart and Jeffrey S. Beckington, Washington, D.C., for intervenor.

### Opinion and Order

MALETZ, Senior Judge:

Presented for the court's consideration is a challenge to the final results of an administrative review conducted by the Department of Commerce, International Trade Administration (ITA), pursuant to section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (Supp. IV 1980).[1] That review involved a clarification of the scope of a dumping finding[2] issued by the government in 1972. *See* 47 Fed.Reg. 28,-978 (1982). Although a series of attacks are mounted against the ITA's section 751 review, the pivotal question is whether certain merchandise—double-gear hub drive speedometers—sold by plaintiff during the section 751 review period is of the same class or kind as that named in the initial 1972 dumping finding.

Plaintiff Diversified Products Corp. (Diversified), an importer of double-gear hub drive speedometers, has moved for judgment on the administrative record pursuant to rule 56.1 of the rules of this court. The government has cross-moved for an affirmance and a partial remand in order that the ITA may redetermine the amount of estimated antidumping duties to be deposited on speedometers manufactured by one of the foreign firms with whom Diversified deals. For the reasons that follow, Diversified's motion is denied and the government's cross-motion is granted.

## I

### Background

The history of this antidumping duty proceeding began in 1971 when a complaint was filed by intervenor Stewart-Warner Corp. with the Treasury Department requesting initiation of a dumping investigation of bicycle speedometers from Japan. A year after the complaint was filed Treasury determined that bicycle speedometers from Japan were being sold at less than fair

---

1. That section provides in part:

§ 1675. *Administrative review of determinations*

(a) *Periodic review of amount of duty*

(1) *In general*

At least once during each 12-month period beginning on the anniversary of the date of publication of ... an antidumping duty order under this subtitle or a [dumping] finding under the Antidumping Act, 1921, ... the administering authority [the ITA] ... shall—

\* \* \* \* \* \*

(B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, ...

\* \* \* \* \* \*

(2) *Determination of antidumping duties*

For the purpose of paragraph (1)(B), the administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority, without revealing confidential information, shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

2. The phrase "dumping finding" used in the Antidumping Act of 1921 was replaced by the expression "antidumping duty order" under the Trade Agreements Act of 1979.

value within the meaning of section 201(a) of the Antidumping Act, 1921, 19 U.S.C. § 160(a) (1970).

For its part, the U.S. Tariff Commission (now the U.S. International Trade Commission) concluded that an industry in the United States was being injured by reason of the importation of those bicycle speedometers. In the course of its injury investigation the Tariff Commission submitted questionnaires to importers and domestic producers. In the definitions section of those questionnaires the term "bicycle speedometers" was defined as

> an instrument attached to a bicycle *or exercise machine* consisting of (1) a head which records miles per hour (MPH) and distance traveled (odometer), whether or not the instrument also indicates rotations per minute (RPM); (2) drive assembly; and (3) cable. [Emphasis added.]

The staff report to the Tariff Commission further reflects an inclusion of speedometers used on both bicycles and exercise machines in its consideration of the product subject to its investigation.

Following the Tariff Commission's injury determination, Treasury published its dumping finding. *See* 37 Fed.Reg. 24,826 (1972).

Shortly after enactment of the Trade Agreements Act of 1979—specifically section 751—the ITA embarked on its statutory task of reviewing all prior dumping findings of the Treasury Department, including the present one. In the preliminary results of its administrative review of the bicycle speedometer dumping finding, the ITA tentatively determined that double-gear hub drive speedometers were not within the scope of the 1972 dumping finding, reserving an ultimate decision on the scope question until publication of the final results of its section 751 review.

The ITA—after reviewing the Tariff Commission's record in the 1972 injury investigation, conducting its own hearing, and considering interested parties' post-hearing briefs—rendered its final results of administrative review which, as previously indicated, included the double-gear hub drive speedometers within the scope of the 1972 dumping finding. Diversified thereupon brought this action, pursuant to 19 U.S.C. § 1516a(a)(2)(A) and 28 U.S.C. § 1581(c), challenging the ITA's section 751 review.[3]

Before turning to Diversified's principal contention that double-gear hub drive speedometers are beyond the scope of the 1972 dumping finding, the court first addresses three subsidiary claims advanced by it: (1) that the transitional rules of the Trade Agreements Act of 1979 prohibit the ITA from conducting a section 751 review in the circumstances presented here; (2) that the ITA is not empowered to clarify the scope of a dumping finding; and (3) assuming *arguendo* it is so empowered, that the ITA is bound by classification determinations of the Customs Service when clarifying the scope of a dumping finding.

## II

### The Transitional Rules

■ Pointing to section 1002(b)(3) of the transitional rules of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144, 307,[4] Diversified argues that the ITA is

---

3. Intervenor advances the somewhat curious argument that this action is not ripe for judicial review in that there is no final agency action until antidumping duties have been assessed. While this argument would have some remote plausibility were judicial review being conducted under the Administrative Procedure Act, 5 U.S.C. § 704 (1976), the short answer is, of course, that it is not. Rather, 19 U.S.C. § 1516a(a)(2)(A) and (B)(iii), which governs here, unmistakably provides for judicial review of all section 751 administrative reviews within thirty days of the date they are published in the Federal Register.

4. That section provides:

> *Certain Countervailing and Antidumping Duty Assessments.*—The amendments made by this title shall apply with respect to the review of the assessment of, or failure to assess, any countervailing duty or antidumping duty on entries subject to a countervailing duty order or antidumping finding if the assessment is made after the effective date. If no assessment of such duty had been made before the effective date that could serve the party seeking review as the basis of a review of the underlying determination, made by the Secretary of the Treasury or the International Trade Com-

powerless to review, much less clarify, the scope of a dumping finding if no assessment of antidumping duties was made prior to the effective date of that Act on the merchandise which is the subject of that finding. Diversified reaches this conclusion based on the contention that the word "review" appearing in section 1002(b)(3) refers to administrative, not judicial, review. The court disagrees.

The court is of the view that precisely the converse is true, that section 1002(b)(3) controls a party's right to judicial, not administrative, review. First of all, section 1002 is one of two sections contained in Title X of the 1979 Act, tellingly entitled "Judicial Review." Second, clear congressional authorization to conduct an administrative review of all pre-Trade Agreements Act dumping findings still in force on the Act's effective date is found in section 106(a) of that Act, 93 Stat. at 193, which states:

SEC. 106. CONFORMING CHANGES.

(a) *Repeal of Old Law.*—The Antidumping Act, 1921 (19 U.S.C. 160 et seq.) is hereby repealed but findings in effect on the effective date of this Act, or issued pursuant to court order in an action brought before that date, shall remain in effect, subject to review under section 751 of the Tariff Act of 1930.

In construing that section this court made clear that section 106(a) "makes old 'findings' subject to review under section 751 without limitation." *Matsushita Electric Industrial Co., Ltd. v. United States,* 2 CIT 263, 266, 529 F.Supp. 670, 673 (1981).

Finally, the legislative history of section 1002(b)(3) indicates that the purpose of that section is to preserve an interested party's opportunity to obtain judicial review of the administrative determinations underlying a dumping finding in those circumstances where no such opportunity had arisen prior to the effective date of the Trade Agreements Act. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 183 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 255 (1979), *reprinted in*

1979 U.S.Code Cong. & Ad.News 381, 641 ("according to subsection 1002(b)(3), ... [i]f no assessment of a countervailing or antidumping duty was made before the effective date ..., then a challenge to the underlying finding or order would be subject to judicial review without regard to the amendments made by title X ...").

In short, section 1002(b)(3) refers to judicial review; it does not preclude the ITA from reviewing a pre-Trade Agreements Act dumping finding for the purpose of ascertaining its scope.

### III

### *The ITA's Power to Clarify*

■ Diversified next proffers two interrelated contentions. The first is that the ITA has no authority to determine in the course of a section 751 review whether a particular imported article is within the scope of a dumping finding. Rather, it submits, this responsibility is within the exclusive purview of the Customs Service. Diversified bases its conclusion on a literal reading of section 751 which, it contends, is devoid of any express grant of power to the ITA to determine whether a given article is encompassed by a dumping finding. As a corollary to this, Diversified submits that even if the ITA is empowered to clarify the scope of dumping findings, it is nevertheless bound by classification determinations of the Customs Service when so clarifying. The court finds each of these contentions without merit.

While it is true that "[t]he starting point in every case involving construction of a statute is the language itself," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975), nevertheless, the Supreme Court has "repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, ..." *Lynch v. Overholser,* 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211

mission before the effective date, on which such order, finding, or lack thereof is based, then the underlying determination shall be sub-

ject to review in accordance with the law in effect on the day before the effective date.

(1962). *See also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). In this connection,

> [I]t is one of the surest indexes of a mature and developed jurisprudence ... to remember that statutes have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

Turning then to a consideration of section 751, that section is pregnant with the implication that it is the ITA's exclusive responsibility to clarify the scope of dumping findings. It provides that the ITA shall determine the value and price of "merchandise subject to the antidumping duty order and included within that determination, ..." Section 751 goes on to state that the ITA "shall publish notice of the results of the determination of antidumping duties ..., and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination...." That section makes no mention of the Customs Service.

What is more, in *Royal Business Machines v. United States,* 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd,* 69 CCPA ——, 669 F.2d 692 (1982), this court implicitly recognized that the ITA has the authority not only to define the scope of an antidumping duty investigation but also to clarify the statement of its scope:

> The court distinguishes between the authority of the Customs Service to classify according to tariff classifications (19 U.S.C. § 1500) and the power of the agencies administering the antidumping law to determine a class or kind of merchandise. The determinations under the antidumping law may properly result in the creation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Ser-

vice. Within the context of an antidumping proceeding the administering agency, at the proper time, can define the class in its terms.

> The Customs Service is placed in a ministerial role by the antidumping law.... Accordingly, it may not independently modify, directly or indirectly the determinations, their underlying facts, or their enforcement.

*Id.* 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18. It follows that if Customs is relegated to a mere "ministerial role," then the ITA necessarily must have the power to clarify the scope of a prior dumping finding.

Finally, it is the ITA which directs Customs to assess antidumping duties on given classes or kinds of merchandise and it is Customs which serves at the behest of the ITA in administering the antidumping duty law. *See* 19 U.S.C. §§ 1673e(a)(1) & 1673h. To this end, it is the statutory responsibility of the ITA to describe for Customs "the class or kind of merchandise ... in such detail as the administering authority [the ITA] deems necessary...." 19 U.S.C. § 1673e(a)(1).

In short, starting from those areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before the court, *see Montana Power Co. v. FPC,* 445 F.2d 739, 746 (1970), *cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971); *Asahi Chemical Industry Co. v. United States,* 4 CIT ——, 548 F.Supp. 1261 (1982), the Trade Agreements Act of 1979 is instinct with the intent that the ITA, not the Customs Service, is responsible for clarifying, where necessary, the scope of dumping findings and antidumping duty orders.

From all that has been said, it is equally clear that the ITA is in no wise obligated to follow nor is it bound by the classification determinations of Customs when it does clarify the scope of a dumping finding. On this score, Diversified contends that inasmuch as Customs has classified double-gear hub drive speedometers as "other than" bicycle speedometers, it is error for the ITA

to include such speedometers as being within the class or kind of merchandise covered by the 1972 dumping finding. The short answer to this contention, of course, is contained in the previously quoted portion of the *Royal Business Machines* decision, namely, that "[t]he determinations under the antidumping law may properly result in the creation of classes which do not correspond to [tariff schedule] classifications . . . or may define or modify a known classification in a manner not contemplated or desired by the Customs Service." *Id.* 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18. While harmony between these two agencies would certainly be a felicitous state of affairs, nothing in the Trade Agreements Act requires them to perform their respective functions in lock step.

Having disposed of these preliminary matters, the court addresses the crux of Diversified's motion—that the ITA's determination that double-gear hub drive speedometers are within the class or kind of merchandise encompassed by the 1972 dumping finding is unsupported by substantial evidence on the record, or otherwise is not in accordance with law.

## IV

### The ITA's Section 751 Review

▮ This court must enforce the ITA's determination if the ITA correctly applied the law and if its findings are supported by substantial evidence on the record viewed as a whole. *See Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 22–23 (1st Cir.1983); 19 U.S.C. § 1516a(b)(2)(B) (Supp. IV 1980). As interpreted by the Supreme Court in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), " '[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* at 477, 71 S.Ct. at 459. In searching the entire record for substantial evidence, a reviewing court "must take into account whatever in the record fairly detracts" from the ITA's fact finding as well as evidence that supports it. *Id.* at 487–88, 71 S.Ct. at 463–64. The court may not substitute its judgment for that of the ITA when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Id.* at 488, 71 S.Ct. at 465. However, it is appropriate to set aside the ITA's decision when the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view." *Id.*

Diversified alleges that the ITA misconstrued the scope of the original dumping investigation and improperly expanded its coverage to include speedometers other than those chiefly used on bicycles. In determining whether specific merchandise is included within the scope of a dumping finding, this court has provided the following general guidelines:

Each stage of the statutory proceeding maintains the scope passed on from the previous stage. . . .

In those administrative proceedings even if plaintiff believed itself to be an "orange" among "apples", so long as the Department of Commerce and the ITC were considering it to belong to a certain class it remained so for the purpose of the proceedings.

*Royal Business Machines,* 1 CIT at 87, 507 F.Supp. at 1013 (footnote omitted).[5] In this connection, the administrative record compiled by the ITA during its section 751 review is replete with evidence showing that the class or kind of merchandise which was examined during the initial dumping investigation included speedometers used on bicycles as well as on exercise machines. The record shows that both the Treasury Department and the Tariff Commission in-

---

5. Since the language of the relevant sections of the former and current antidumping laws track nearly verbatim, this court's statements in *Royal Business Machines* are equally applicable to the scope of the 1972 dumping finding. *See Matsushita Electric Industrial Co. v. United States,* 2 CIT 263, 264 n. 3, 529 F.Supp. 670, 671 n. 3 (1981).

vestigated and determined that there was dumping of speedometers of a class or kind used on bicycles *and* exercise machines.

As for Treasury, it is true that when it published its notice of dumping finding in 1972, Treasury described the subject merchandise simply as "bicycle speedometers from Japan." *See* 37 Fed.Reg. 24,826. However, in 1972 Customs was in fact classifying speedometers intended for use on exercise machines as bicycle speedometers. Moreover, the record of the Tariff Commission's injury investigation shows that speedometers used on exercise machines were included in that investigation. For example, the Commission's questionnaire to domestic manufacturers defined "bicycle speedometer" as "an instrument attached to a bicycle or exercise machine." In addition, the staff report to the Commission described a bicycle speedometer "as an accessory type instrument that is attached to a nonmotorized bicycle and to an exercise machine."

Diversified's assertion to the contrary notwithstanding, the record does not suggest that either Treasury or the Commission restricted the scope of "bicycle speedometers" to speedometers chiefly used on bicycles. The fact that Customs does not presently classify double-gear hub drive speedometers as bicycle speedometers because they are not chiefly used on bicycles is immaterial. *See Royal Business Machines,* 1 CIT at 87 n. 18, 507 F.Supp. at 1014 n. 18. There is no question that the class or kind of merchandise initially investigated by the government included *all* bicycle-type speedometers. Thus, in its notice of final results the ITA correctly found that the scope of the earlier dumping investigation covered speedometers used on both bicycles and exercise machines.

In addition to this finding, inasmuch as double-gear hub drive speedometers had not yet been developed at the time of the 1972 dumping investigation, the ITA went on to determine whether these speedometers belong to the class or kind of merchandise encompassed in the 1972 finding, employing the following criteria: the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels of trade in which the merchandise moves, the ultimate use of the merchandise, and cost. *See, e.g., United States v. The Carborundum Company,* 63 CCPA 98, 102, C.A.D. 1172, 536 F.2d 373, *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976); *B. & K. Instruments, Inc. v. United States,* 82 Cust.Ct. 219, 227, C.D. 4803 (1979).

Applying the first of these criteria, the general physical characteristics of the single-gear and double-gear speedometers are virtually identical, any differences in this respect being *de minimis.* One difference is that the latter has an additional "idler" gear which enables it to be mounted on either side of a wheel and still function. Despite this difference, the ITA found and the record reflects that single-gear and double-gear hub drive speedometers have the identical end use: to measure speed and distance on either bicycles or exercise machines. Thus, the ultimate use of the merchandise is the same for both single- and double-gear speedometers. Moreover, it is undisputed that both kinds of speedometers are in fact used on exercise machines by the ultimate purchaser. When this fact is coupled with the identity of purpose of these speedometers, the expectation of purchasers of either type of speedometer is the same.

Record support also exists for the ITA's finding that double-gear hub drive speedometers are marketed at wholesale in the same channels of trade as single-gear speedometers. Both types of speedometers are sold by wholesale distributors in kit form to original equipment manufacturers of bicycles and exercise machines.

The last factor which the ITA considered in its review was cost. Here, the record reflects a cost difference of approximately 11 cents between single- and double-gear hub drive speedometers. The ITA found and the court agrees that this is an insignificant cost difference, considering a U.S. price of approximately $4.50 per unit.

All in all, the court finds substantial evidence on the record viewed as a whole to

support the ITA's conclusion that double-gear hub drive speedometers are of the same class or kind of merchandise which was the focus of the 1972 dumping finding.

The court turns finally to the question of the appropriate amount of cash deposits to be imposed on the merchandise.

## V

### *Antidumping Duty Deposits*

■ Diversified challenges the ITA's decision to require cash deposits of 25.98%—the highest rate assessed against a responding firm under the section 751 review. Having reconsidered its decision, the ITA now concedes that it applied an incorrect rate. It has, for that reason, requested a remand in order to adjust the deposit rate to a percentage derived from the weighted average rate computed for all responding firms.

Diversified counters that inasmuch as the ITA never computed a dumping margin for double-gear hub drive speedometers of Diversified's primary Japanese supplier, no estimated cash deposits may be required of it.[6] Diversified's position, however, is based on a misapprehension of the law. Section 736(a)(3) of the Trade Agreements Act of 1979, 19 U.S.C. § 1673e(a)(3), provides in part that the ITA shall publish an antidumping order which requires the deposit

of *estimated* antidumping duties pending the liquidation of entries. Those duty deposits are estimates only and are adjusted at the time of liquidation in accordance with 19 U.S.C. § 1673f. There is no statutory support for Diversified's theory that if there is insufficient data available to assess absolutely accurate amounts for such duty deposits that they may not be required until the next section 751 review.

Under the circumstances presented here the court is of the view that imposition of estimated duty deposits based on the weighted average rate is proper.

## VI

### *Conclusion*

For all the foregoing reasons, Diversified's motion for judgment on the administrative record is denied, and the ITA's cross-motion is granted. This case is remanded to the ITA with directions to redetermine the amount of estimated antidumping duty deposits in a manner consistent herewith.

---

**6.** Intervenor has taken the position that the ITA was initially correct.