**Slip Op. 07-29**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CABLESA S.A. DE C.V., | : |
| *Plaintiff,* | : |
| v. | : |
| UNITED STATES, | : |
| *Defendant,* | :      Court No. 05-00388 |
| and | : |
| AMERICAN SPRING WIRE CORP.,<br>  INSTEEL WIRE PRODUCTS COMPANY,<br>  and SUMIDEN WIRE PRODUCTS CORP., | : |
| *Defendant-Intervenors.* | : |

[Commerce's Final Scope Determination is sustained.]

Decided:   March 1, 2007

Arent Fox, PLLC (Kay C. Georgi and Mark P. Lunn), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Marisa B. Goldstein, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, R. Alan Luberda, and David C. Smith, Jr.), for Defendant-Intervenors.

### OPINION

RIDGWAY, Judge:

In this action, Plaintiff Cablesa S.A. de C.V. – a Mexican manufacturer of prestressed concrete steel wire strand ("PC strand") – contests the U.S. Department of Commerce's final

determination that Cablesa's zinc-coated product is within the scope of the antidumping duty order

on PC strand from Mexico. *See* Prestressed Concrete Steel Wire Strand from Mexico: Scope Inquiry

Final Determination, Inv. No. A-201-831 (June 16, 2004) ("Final Scope Determination").

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which

Cablesa urges that Commerce's Final Scope Determination be vacated. Emphasizing that the

antidumping duty order at issue expressly excludes "galvanized" PC strand, and asserting that its

zinc-coated product is in fact "galvanized," Cablesa contends that Commerce should have reached

a negative scope determination without conducting a <u>Diversified Products</u> analysis. In the

alternative, Cablesa argues that Commerce's <u>Diversified Products</u> analysis was flawed, and that the

agency's conclusion as a result of that analysis is not supported by substantial evidence in the

record. *See generally* Plaintiff's Memorandum in Support of Motion for Judgment on the Agency

Record ("Pl.'s Brief"); Reply Brief in Support of Plaintiff's Rule 56.2 Motion for Judgment Upon

the Agency Record ("Pl.'s Reply Brief").

Cablesa's motion is opposed by the Government and by Defendant-Intervenors, American

Spring Wire Corporation, Insteel Wire Products Company, and Sumiden Wire Products Company

("the Domestic Industry"), who maintain that the Final Scope Determination is supported by

substantial evidence and is otherwise in accordance with law, and should therefore be sustained in

all respects. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Motion for

Judgment Upon the Agency Record ("Def.'s Brief"); Defendant-Intervenors' Memorandum in

Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Def.-Ints.' Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[1]  For the reasons set forth below, Cablesa's Motion for Judgment on the Agency Record is denied.

## I. **Background**

In late February 2003, the Commerce Department initiated an antidumping investigation of prestressed concrete steel wire strand ("PC strand") from Mexico (among other countries), pursuant to a petition filed by the Domestic Industry.  *See* Prestressed Concrete Steel Wire Strand from Brazil, India, the Republic of Korea, Mexico, and Thailand: Initiation of Antidumping Duty Investigations, 68 Fed. Reg. 9050 (Feb. 27, 2003) ("Notice of Investigation").  The Notice of Investigation defined the scope of the investigation at issue:

> For purposes of these investigations, prestressed concrete steel wire (PC strand) is steel strand produced from wire of non-stainless, *non-galvanized* steel, which is suitable for use in prestressed concrete (both pretensioned and post-tensioned) applications.  The product definition encompasses covered and uncovered strand and all types, grades, and diameters of PC strand.

> The merchandise under these investigations is currently classifiable under subheadings 7312.10.3010 and 7312.10.3012 of the Harmonized Tariff Schedule of the United States (HTSUS).  Although the HTSUS subheadings are provided for convenience and Customs purposes, the written description of the merchandise under investigation is dispositive.

Notice of Investigation, 68 Fed. Reg. at 9050-51 (emphasis added).

---

[1]All statutory citations herein are to the 2000 edition of the U.S. Code.

Similarly, all citations to regulations are to the 2003 edition of the Code of Federal Regulations.  However, the pertinent text of the cited provisions remained the same at all relevant times.

The Notice of Investigation thus framed the scope of the investigation in language that was broad and inclusive (encompassing "covered and uncovered strand and all types, grades, and diameters of PC strand"), carving out two specific exceptions for wire that was produced from either "stainless" or "galvanized" steel. Neither "stainless" nor "galvanized" were further defined in either the Domestic Industry's petition or the Notice of Investigation.[2]

The Notice of Investigation invited comments from interested parties as to the scope of products to be either covered or excluded from the antidumping investigation. *See* Notice of Investigation, 68 Fed. Reg. at 9050-51. In response, Cablesa filed comments asserting that Commerce should exclude from the investigation PC strand coated with textile or any other "nonmetallic" material, in particular plastic-coated ("covered") PC strand. *See generally* Domestic Industry's Rebuttal Letter (April 23, 2004). Cablesa's comments made no reference to PC strand coated with zinc.

In its Preliminary Antidumping Determination, the Commerce Department concluded that "covered" (*e.g.*, plastic-coated) PC strand was included in the scope of the investigation, and that both covered and uncovered PC strand "constitute one class or kind of merchandise," based on the agency's analysis of the five <u>Diversified Products</u> criteria. *See* Prestressed Concrete Steel Wire Strand from Mexico: Notice of Preliminary Determination, 68 Fed. Reg. 42,378, 42,379 (July 17, 2003) ("Preliminary AD Determination") (*citing* <u>Diversified Prods. Corp. v. United States</u>, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983)). Commerce further stated that the "defining characteristic

---

[2]The petition filed by the Domestic Industry noted that PC strand covered by the investigation generally is produced to ASTM specifications (specifically, ASTM A-416).

of these products continues to be the strand, and covering the merchandise does not change the strand or its chemical or physical properties." *Id*. The Preliminary AD Determination calculated Cablesa's preliminary dumping margin at 77.2%. *Id*. at 42,382.[3]

Cablesa first mentioned the existence of U.S. sales of its zinc-coated PC strand only after the factual record of the antidumping investigation had closed. *See* Domestic Industry's Scope Request (Feb. 6, 2004) at 2. In response, the Domestic Industry sought to have Commerce confirm that only PC strand manufactured from steel wire that conformed to ASTM A-475 ("Standard Specification for Zinc Coated Steel Wire Strand") qualified under the exclusion for "galvanized" steel wire. *See* Pl.'s Brief at 4. However, Commerce rejected the Domestic Industry's requests as untimely. *See id*.

In early December 2003, Commerce reached its final determination in the antidumping investigation, calculating Cablesa's final antidumping duty margin based on total adverse facts available (as its preliminary margin had been calculated). *See* Prestressed Concrete Steel Wire Strand from Mexico: Notice of Final Determination of Sales at Less Than Fair Value, 68 Fed. Reg. 68,350, 68,350-51 (Dec. 8, 2003) ("Final AD Determination"). In late January 2004, Commerce's Antidumping Order issued, directing Customs to assess antidumping duties on Cablesa's entries of subject merchandise. The scope language in both the Final AD Determination and the Antidumping Order was virtually identical to the language in the Notice of Investigation. No further explanation

---

[3]Commerce calculated Cablesa's preliminary margin based on total adverse facts available, based on its determination that Cablesa had provided unreliable and misleading information in the course of the investigation. *See* Preliminary Determination, 68 Fed. Reg. at 42,380-82. Commerce's use of adverse facts available is not contested here.

of what constituted "galvanized" steel wire was provided. *See* Final AD Determination, 68 Fed. Reg. at 68,350; Prestressed Concrete Steel Wire Strand from Mexico: Notice of Antidumping Duty Order, 69 Fed. Reg. 4112 (Jan. 28, 2004) ("Antidumping Order").[4]

In January 2004, Cablesa attempted to import its zinc-coated PC strand without paying antidumping duties, asserting that the product was excluded from the scope of the Antidumping Order as "galvanized" PC strand. Customs disagreed, and Cablesa sought a ruling from the Commerce Department. *See* Cablesa's Scope Request (Feb. 3, 2004).

The Domestic Industry filed its own request for a ruling several days later. The Domestic Industry urged Commerce to find that, "for purposes of the antidumping duty order, the term 'galvanized' has its common meaning in the industry, and that meaning is that the product must be coated with a continuous and reasonably uniform layer of zinc and/or zinc oxide to the minimum specifications set forth in ASTM A-475, which represents the industry understanding of the minimum zinc application necessary to meet the purpose of preventing corrosion." *See* Domestic Industry's Scope Request (Feb. 6, 2004) at 3.[5]

In determining whether a product is within the scope of an antidumping duty order, Commerce engages in a three-step process. Commerce first must examine the language of the order at issue. The "predicate for the interpretive process is language in the order that is subject to interpretation." Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1383 (Fed. Cir. 2005). If the

---

[4]Commerce made only the necessary conforming changes, such as changing the language "merchandise under these investigations . . ." to "merchandise subject to the order . . . ." *Id*.

[5]The Domestic Industry also argued that, because Cablesa's zinc-coated product is classified within the HTSUS numbers specified in the petition and in the Antidumping Order, it is subject merchandise. *Id*.

terms of the order are dispositive, then the order governs. If the order alone is not dispositive, the interpretive process is governed by 19 C.F.R. § 351.225(d), which directs Commerce to determine whether it can make a ruling based upon the request for a scope ruling and the factors listed in section 351.225(k)(1) – specifically, "the descriptions of the merchandise contained in the petition, the initial investigation, and the determinations [of Commerce] (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). If that analysis is not dispositive, Commerce initiates a scope inquiry pursuant to 19 C.F.R. § 351.225(e), and applies the five Diversified Products criteria as codified in the agency's regulations. *See* 19 C.F.R. § 351.225(k)(2); Diversified Prods., 6 CIT 155, 572 F. Supp. 883.

In this case, Commerce found that the scope of the order was ambiguous and subject to interpretation as to the definition of "non-galvanized" wire. Commerce examined the Antidumping Order, the underlying petition, and the preliminary and final results of the investigations of both Commerce and the ITC. Commerce also considered the arguments advanced by Cablesa and the Domestic Industry as to the definition of PC strand made from galvanized wire.

Cablesa asserted that its "galvanizing process and the zinc content of [its] product meet all applicable industry standards and guidelines for galvanized product," although it provided no galvanization standard applicable to PC strand. *See* Cablesa's Scope Request at 8. The Domestic Industry argued, in turn, that galvanized PC strand is understood in the industry to mean PC strand "coated with a continuous and reasonably uniform layer of zinc and/or zinc oxide to the minimum specifications set forth in ASTM A-475." Domestic Industry's Scope Request at 3. The Domestic Industry further argued that the plain language of the petition states that only galvanized wire strand

that falls outside the HTSUS numbers listed in the Antidumping Order is excluded from the scope

of the order. According to the Domestic Industry, "because Cablesa's zinc-coated product is

classified within the HTSUS numbers listed in the petition and the scope of the order, it is subject

PC strand." *Id*.

Commerce determined that the scope language of the Antidumping Order, together with the

product descriptions in the original petition and the Commission's preliminary and final

determinations, provided no clear definition of galvanized PC strand. *See* Scope Inquiry Initiation

(Feb. 23, 2004) at 3. Commerce therefore initiated a scope inquiry pursuant to 19 C.F.R. §

351.225(e). In the course of its inquiry, Commerce issued two questionnaires to Cablesa, requesting

information relevant to the Diversified Products criteria, including the physical characteristics of

Cablesa's zinc-coated PC strand, the expectations of ultimate purchasers, the ultimate use of the

merchandise, channels of trade, and how the merchandise is advertised and displayed. Cablesa

responded, and all parties filed comments and rebuttal comments.

Commerce's Final Scope Determination concluded that Cablesa's zinc-coated PC strand

"did not differ in any material way from the grease and plastic coated PC strand also sold by

Cablesa," and did not "meet any industry standard for galvanization." Final Scope Determination

at 1. The Final Scope Determination further explained:

> Cablesa's PC strand with a 0.05 oz./sq. ft. zinc coating has no physical properties or
> end uses that are substantially different from subject PC strand. Cablesa has not
> presented any recognized industry standard to support its claim that its 0.05 oz./sq.
> ft. zinc coated PC strand is truly galvanized or any technical evidence that a zinc
> coating of 0.05 oz./sq. ft. provides better corrosion protection than a plastic and
> grease coating.

Final Scope Determination at 8. Accordingly, Commerce determined that Cablesa's zinc-coated PC

strand was included within the scope of the original Antidumping Order on PC strand from Mexico, and that PC strand is properly classified as "galvanized" only if it meets ASTM A-475 standards. *Id*.

## II.  Analysis

Cablesa contends that the Commerce Department erred in finding that "non-galvanized steel" was ambiguous as used in the Antidumping Order and, thus, that Commerce improperly conducted a Diversified Products analysis rather than finding that Cablesa's zinc-covered PC strand was excluded from the scope of the Order pursuant to 19 C.F.R. § 351.225(d).

Distilled to its essence, Cablesa's theory is that the plain meaning of the language defining the scope of the Antidumping Order can be discerned by reference to the American Heritage Dictionary, which defines "galvanized" as "to coat (iron or steel) with *rust-resistant* zinc." *See* American Heritage Dictionary of the English Language at 744 (3d ed. 1992) (emphasis added). Cablesa emphasizes that its product is in fact coated with zinc, and thus affords protection against corrosion, which is the purpose of galvanization. As discussed below, however, Cablesa's arguments are unavailing.

A.

The Commerce Department's starting point was the relevant language of the Antidumping Order itself. A review of that language indicates that it is quite broad, encompassing "all types, grades and diameters" of PC strand, including both covered and uncovered (or coated and uncoated) PC strand. On its face, the Order is broadly written to embrace PC strand with any covering or

coating, as further specified under the HTSUS.[6]  Although an order cannot be interpreted broadly

when a broad construction is "belied by the terms of the order," the language of the Order at issue

here is generally expansive.  *See* Allegheny Bradford Corp. v. United States, 28 CIT ____, ____,

342 F. Supp. 2d 1172, 1186-87 (2004) (*citing* Duferco Steel Inc. v. United States, 296 F.3d 1087,

1098 (Fed. Cir. 2002), *quoting* Eckstrom Indus. Inc. v. United States, 254 F.3d 1068, 1073 (Fed. Cir.

2001)).

The language of the Antidumping Order does define the subject merchandise to require that

the strand be manufactured from "non-stainless, *non-galvanized* steel."  Cablesa argues that there

is no need to resort to extrinsic evidence to define "non-galvanized steel" wire.  But Cablesa itself

looks beyond the four corners of the Order and invokes the American Heritage Dictionary to support

its claim that its zinc-coated product is a "galvanized" product outside the scope of the Order.  Thus,

as even Cablesa implicitly concedes, reference to *some* extrinsic evidence is necessary to give

meaning to the term "galvanized" as it is used in the Antidumping Order.  It is Commerce's decision

to resort to industry standards rather than a dictionary that is the gravamen of Cablesa's complaint.

Commerce's reasoning in this case is fully consonant with the case law in similar cases

involving  ambiguity in the definition of manufacturing processes.  In Novosteel, for example, the

Court of Appeals held that Commerce properly applied the Diversified Products factors where the

petitions and the initial investigations failed to clarify whether the term "flat-rolled" unambiguously

encompassed the merchandise in question.  *See* Novosteel, SA v. United States, 284 F.3d 1261,

---

[6]The petition filed by the Domestic Industry indicated that ASTM-conforming galvanized PC strand was classified under a different tariff subheading (HTSUS 7312.10.3074) than subject PC strand.  *See generally* Domestic Industry's Scope Request at Exhs. 6, 7.

1266, 1274 (Fed. Cir. 2002).    Similarly, the court in Tak Fat agreed that the terms "pickled,"

"marinated," and "acidified," as used in an antidumping order on preserved mushrooms, were

subject to interpretation.  The court upheld Commerce's reliance on extrinsic evidence to establish

a minimum acid content for "acidified" mushrooms (an undefined term set forth in the order), and

rejected the foreign producer's argument that any acid content qualified its product for exclusion

from the order.  *See* Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1385-86 (Fed. Cir. 2005).

*See also* Allegheny Bradford, 28 CIT at ____, 342 F. Supp. 2d at 1186 (as used in order, terms

"elbows," "trees," "reducers," "stub ends," and "caps" were "general," and allowed Commerce

"room to interpret whether a given product bears a shape that is covered by the scope").

As the Government aptly observes, like the production processes referred to in the orders at

issue in Novosteel and Tak Fat, the term "galvanized" in the Order here "generally *identifies* a

process without specifically *defining* the process."  *See* Def.'s Brief at 11.  It was therefore not

unreasonable for Commerce to find that the scope of the Order was ambiguous and that a Diversified

Products analysis was necessary.

Relying on Ericsson, Cablesa seeks to portray Commerce's actions as an impermissible and

unfair expansion of the scope of the Order.  *See* Pl.'s Brief at 13-14; Pl.'s Reply Brief at 5 (*citing*

Ericsson GE Mobile Communications, Inc. v. United States, 60 F.3d 778, 782 (Fed. Cir. 1995)).  But

– in contrast to Ericsson – Commerce in this case did not abandon one scope determination for a

more exacting one.  *See* Ericsson, 60 F.3d at 783.  Nor did Commerce nullify any portion of the

Order's scope which would otherwise have excluded Cablesa's product (as Commerce was found

to have done in <u>Allegheny Bradford</u>).[7]  Thus, for example, Commerce did not re-define the scope

of the Order to include galvanized steel (a product that is excluded by the plain language of the

Order).  Commerce instead sought merely to determine the meaning of "non-galvanized steel" as

that term was used in the Order.

Contrary to Cablesa's claims, the facts of this case are closer to <u>San Francisco Candle</u> than

to <u>Ericsson</u>.  *See generally* <u>San Francisco Candle Co., Inc. v. United States</u>, 104 Fed. Appx. 714

(Fed. Cir. 2004), *aff'g* 27 CIT 704, 265 F. Supp. 2d 1374 (2003).  The Court of Appeals there

reasoned that Commerce could apply an objective test to determine whether certain products fell

under an exclusion from the scope of an antidumping order on petroleum wax candles from China.

*See* <u>San Francisco Candle</u>, 104 Fed. Appx. at 717 (discussing Commerce's application of "minimally

decorative" test to determine which candles are excluded from scope of order as Christmas novelty

candles); *see also* <u>Tak Fat</u>, 396 F.3d at 1386 (sustaining Commerce's use of standard definition of

"pickling" and "acidified" based upon acetic acid concentrations).

So too Commerce in this case reasonably determined that the scope of the Order was

ambiguous, and sought to establish an objective standard for products falling within the exclusion

for PC strand made of galvanized wire.  Indeed, as the Government notes, Cablesa itself implicitly

conceded in the course of the scope inquiry that there is some amount of zinc coating that – as a

practical matter – does not suffice to resist corrosion.  *See* Def.'s Brief at 10 (*citing* Cablesa's Scope

---

[7]Invoking <u>Allegheny Bradford</u>, Cablesa argues that including its zinc-coated PC strand within the scope of the Order undermines the "integrity of the investigation's prior stages."  *See* Pl.'s Brief at 18 (*citing* <u>Allegheny Bradford</u>, 28 CIT at _____, 342 F. Supp. 2d at 1188.  As the Domestic Industry notes, however, the existence of imports of Cablesa's zinc-coated PC strand were not disclosed until late in the investigation.  *See* Def.-Ints.' Brief at 24.

Request at 8, which asserted that the zinc coating on Cablesa's product meets the industry standard

sufficient to prevent corrosion). In contrast, in the course of this litigation, Cablesa went so far as

to claim that "any strand coated with *any level of zinc* is excluded from the scope of [this] order."

*See* Pl.'s Brief at 19. Taking that argument to its logical extreme, the Domestic Industry pointedly

notes that "[u]nder Cablesa's logic, a PC strand coil that was spray painted with zinc paint, or that

contained trace amounts of zinc within the wire itself, would be excluded as 'galvanized' because

it contained or was coated with some zinc." *See* Def.-Ints.' Brief at 20.[8]

In sum, nothing required Commerce to reject technical standards developed within the

industry in favor of an arbitrary definition of "galvanized" – much less no definition at all.[9]

Commerce committed no error in determining that the term "galvanized" was ambiguous as used

in the scope of the Order and proceeding to a <u>Diversified Products</u> analysis.

---

[8]The Domestic Industry seeks to drive its point home by reference to another critical term that is not defined in the Order in this case: "[T]he Order . . . also states that PC strand made from stainless wire is excluded. Like the term 'galvanized,' the term 'stainless' is subject to detailed industry standards as to minimum levels of specified alloy contents. The dictionary, however, merely defines 'stainless steel' as 'steel alloyed with chromium, etc., virtually immune to rust and corrosion.' *See* Webster's New World Dictionary at 1304 (3d College Ed. 1988). If such simplistic dictionary terms were employed to define steel terms that are recognized within the industry to have very specific meanings, foreign producers intent on evading an order could easily undertake a slight modification to their product and claim that the product falls outside a generic dictionary definition of a term." *See* Def.-Ints.' Brief at 20-21.

[9]Cablesa emphasizes that Commerce rebuffed the Domestic Industry's attempts in the course of the antidumping proceeding to persuade the agency to define "galvanized" by reference to ASTM A-475. *See generally* Pl.'s Brief at 4, 11. But Cablesa reads much too much into Commerce's rejection of the Domestic Industry's submissions. Commerce simply returned the submissions as untimely. In accordance with 19 C.F.R. § 351.104, Commerce did not consider the content of the submissions, and did not address the merits of the Domestic Industry's claims. *See* Def.'s Brief at 13; Def.-Ints.' Brief at 5.

B.

Cablesa contends that, even if a <u>Diversified Products</u> analysis was warranted, Commerce's conduct of that analysis was flawed, and the conclusion that the agency reached was erroneous. *See generally* Pl.'s Brief at 20-23; Pl.'s Reply Brief at 8-15. As detailed below, however, Commerce's analysis was generally sound, and its Final Scope Determination is both supported by substantial evidence in the record and otherwise in accordance with law.

1. <u>Cablesa's Threshold Claim</u>

Cablesa's threshold attack on Commerce's <u>Diversified Products</u> analysis accuses Commerce of engaging in circular logic and defeating the purpose of the <u>Diversified Products</u> analysis by defining "galvanization" before examining the physical characteristics of Cablesa's zinc-coated PC strand. *See generally* Pl.'s Brief at 22-23; Pl.'s Reply Brief at 8-10. To be sure, Commerce might have articulated parts of its rationale more artfully. But Cablesa's critique is largely lacking in merit.

Contrary to Cablesa's assertions, Commerce did not define the standard for PC strand made from galvanized wire before analyzing the <u>Diversified Products</u> factors. Rather, Commerce compared Cablesa's zinc-coated product to two standards – one recognized by all to be galvanized (ASTM A-475), and the other recognized by all to be non-galvanized (subject PC strand). *See generally* Final Scope Determination at 6-7; Def.'s Brief at 14-15. Commerce considered the arguments and factual submissions of both Cablesa and the Domestic Industry. And, when Cablesa asserted that its zinc-coated PC strand met the minimum industry standards for galvanization, Commerce properly requested that Cablesa identify any standards on which it relied. But Cablesa

then argued – as it does now – that in fact no such standard exists. *See* Cablesa's Scope

Questionnaire Responses (March 18, 2004) at 2-5 (stating "no ASTM standard applies to galvanized

PC strand" and "there are no official specifications for galvanized PC strand").

    2. Cablesa's Challenges to the Merits of Commerce's "Diversified Products" Analysis

As discussed above, in Diversified Products, this court held that – in determining whether

a product falls within the scope of an order – Commerce should consider five criteria: (1) the

physical characteristics of the product in question as compared to subject merchandise; (2) customer

expectations with respect to the product in question as compared to subject merchandise; (3) end

uses of the product at issue as compared to subject merchandise; (4) channels of distribution for the

product at issue as compared to subject merchandise; and (5) the manner in which the products are

advertised and displayed. *See generally* Diversified Prods., 6 CIT at 162, 572 F. Supp. at 889; 19

C.F.R. § 351.225(k)(2). In the case at bar, Commerce properly determined that – while the fifth

criterion is not relevant to the PC strand industry – the remaining four factors all support the

conclusion that Cablesa's zinc-coated PC strand is within the scope of the Order.

The parties' arguments as to each of the four applicable criteria are addressed below, in turn.

a. Physical Characteristics

Commerce's determination that the physical characteristics of Cablesa's zinc-coated PC

strand are not materially different from PC strand covered by the Order is supported by substantial

evidence. As part of its Diversified Products analysis, Commerce compared the physical

characteristics of Cablesa's PC strand to both subject PC strand and ASTM A-475, the generally-

accepted industry standard for galvanization of steel wire, to determine whether Cablesa's product

met the requirements for exclusion from the Order – that is, whether Cablesa's product is indeed

"galvanized." *See generally* Final Scope Determination at 6. Commerce concluded that, although

PC strand made from ASTM A-475 galvanized wire is substantially different from subject PC

strand, Cablesa's zinc-coated PC strand lacks physical properties sufficient to differentiate it from

subject PC strand in any significant way. *Id*. at 8.

Comparing the physical characteristics of the respective products, Commerce found that "the

physical properties and end uses of galvanized PC strand per ASTM A-475 are substantially

different from subject PC strand," while Cablesa's zinc-coated PC strand "has no physical properties

or end uses that are substantially different from subject PC strand." *See* Final Scope Determination

at 8. In examining Cablesa's zinc-coated product, Commerce properly focused on the zinc coating,

because all parties agreed that the diameter, grade, and "type" (normal or low relaxation) of

Cablesa's zinc-coated product was covered by the Order. *See*, *e.g.*, Domestic Industry's Scope

Request at 9, 12. Those other physical properties are identical to the physical properties of subject

PC strand and are, indeed, the critical properties identified in the specification for PC strand. In

particular, ASTM A-416 sets forth the defining characteristics of PC strand, and refers to three

physical characteristics – diameter, grade, and type (normal or low relaxation).

Cablesa concedes that its zinc-coated PC strand satisfies all of the technical specifications

for subject PC strand consistent with ASTM A-416. Cablesa therefore emphasizes the zinc coating

on its product to attempt to distinguish its PC strand from the other PC strand products covered by

the Order. *See generally* Pl.'s Brief at 23-31. Cablesa maintains that the zinc coating it applies

provides "protection against corrosion," rendering its product more like galvanized PC strand conforming to ASTM A-475 (which is excluded from the Order) than it is to the PC strand products that are subject to the Order. *Id.*

However, Commerce found that the zinc coating applied to Cablesa's PC strand is minimal – 0.05 oz./sq. ft., in contrast to the minimum coating weight of 0.40 oz./sq. ft. required for "galvanized" steel wire, as specified by ASTM A-475. *See* Final Scope Determination at 2-7. Other record evidence indicated that, in violation of ASTM A-475, the zinc coating on Cablesa's product was not uniform, but was instead thin and uneven. *See* Domestic Industry's Scope Request at 11-12. In addition, there was evidence that samples of Cablesa's zinc-coated PC strand showed evidence of corrosion only a few months after importation, indicating a lack of the corrosion-resistance that one would expect of a "galvanized" product. *Id.* at l2.

Moreover, as Commerce found, even if the zinc coating applied to Cablesa's product in fact imparted some modest incremental degree of corrosion resistance to the PC strand, that fact alone would not be sufficient to distinguish Cablesa's product from subject PC strand. *See* Final Scope Determination at 7. In the original antidumping investigation, for example, Commerce concluded that *plastic-coated* PC strand was properly within the scope of the investigation (notwithstanding whatever additional protection the plastic coating might provide). As Commerce there stated, the "defining characteristic [of PC strand] continues to be the strand, and covering the merchandise does not change the strand or its chemical or physical properties." *See* Preliminary AD Determination, 68 Fed. Reg. at 42,379 (citation omitted).

Evidence of record supports Commerce's finding that the zinc coating on Cablesa's PC strand does not provide the corrosion resistance that Cablesa claims. For example, the results of tests conducted on a sample of Cablesa's product indicated that it had an average zinc coating weight on each of the seven wires of the strand of only 0.039 oz./sq. ft. – below even the 0.05 oz./sq. ft. coating that Cablesa claims, and less than one-tenth of the zinc coating required for galvanized steel wire under ASTM A-475. The tested sample also showed evidence of corrosion. *See generally* Domestic Industry's Scope Request at Atts. 1, 4. The ASTM A-475 specification for galvanized steel requires that the zinc coating be "continuous and reasonably uniform." Cablesa's product did not meet that requirement.

In an effort to respond to the test results, Cablesa provided an affidavit from Dr. Ned Burns, to support its claims as to the alleged corrosion resistant properties and the galvanized nature of its zinc-coated PC strand. *See* Cablesa's Additional Scope Comments (April 6, 2004) at Att. A. However, information and argumentation submitted by the Domestic Industry substantially undermined the Burns Affidavit. *See generally* Def.-Ints.' Brief at 29.

For example, the Domestic Industry questions whether the sample of zinc-coated PC strand that Cablesa provided to Dr. Burns was representative. *Id.* The Domestic Industry further notes that there is no evidence that Dr. Burns tested the sample that he received; the record is thus devoid of any test results to rebut those submitted by the Domestic Industry. *Id.* Nor did the Burns Affidavit attest that Cablesa's zinc-coated PC strand conformed to any independently-published standards for specified characteristics of galvanized steel. *Id.*

Cablesa argues that it should not be required to identify independent sources or standards to establish that its product is galvanized. However, Commerce had to weigh the Burns Affidavit in light of the evidence submitted by the Domestic Producers that undercuts – and, in some instances, flatly contradicts – Dr. Burns' findings. Under the circumstances, it was not unreasonable for Commerce to seek information from objective or independent sources to support the contentions in the parties' submissions.

Cablesa also submitted internal company documents such as purchase orders and mill certificates in an effort to prove customer demand for its zinc-coated PC strand, and points to those documents as evidence that its zinc-coated PC strand is recognized as galvanized. *See generally* Pl.'s Brief at 31-34. But Commerce and the Domestic Producers identified numerous internal inconsistencies and discrepancies in Cablesa's documents. Under the circumstances, it was not unreasonable for Commerce to decline to rely on them.

Commerce concluded that "the primary purpose of galvanization is to protect steel which is exposed to the elements from corrosion and it does not appear that Cablesa's product rises to this level." *See* Scope Determination at 7. Contrary to Cablesa's claim that Commerce never actually determined that its zinc-coated PC strand is, in fact, not galvanized (*see* Pl.'s Brief at 12), the Final Scope Determination expressly states that Cablesa's product "does not have the physical characteristics described in any industry standard for galvanization." *See* Final Scope Determination at 6.

Based on the record evidence as a whole, Commerce found that the physical characteristics of Cablesa's PC strand were comparable to those of subject PC strand products within the scope of

the Order, because an objective, quantitative, generally-accepted industry standard requires that PC strand be coated with a uniform layer of at least .40 oz./sq. ft. of zinc to be considered galvanized (in contrast to the 0.05 oz./sq. ft. that Cablesa claims). *See* Final Scope Determination at 6-7. Commerce further found that – even if it accepted Cablesa's argument that the zinc coating on its product provided some incremental corrosion protection – it offered no protection beyond that afforded by the plastic-coated PC strand that is subject to the Order. *See* Final Scope Determination at 6-7. In this sense, Cablesa's product is not "like" the ASTM-conforming galvanized steel that is excluded from the Order, and it is instead "like" the subject PC strand covered by the Order. Moreover, Cablesa presented no other evidence to suggest that the physical characteristics of its zinc-coated PC strand differed in any other way from subject PC strand.

Accordingly, substantial record evidence supports Commerce's conclusion as to the first criterion in its <u>Diversified Products</u> analysis. Cablesa's zinc-coated PC strand has no physical properties different from subject PC strand.

b. <u>Customer Expectations</u>

In the course of its analysis of the second <u>Diversified Products</u> criterion, Commerce determined that Cablesa's customers had no unique expectations for Cablesa's product beyond those for regular, non-coated PC strand. *See* Final Scope Determination at 7. Indeed, Commerce relied in part on Cablesa's own statements that its zinc-coated product is used for the same applications as subject PC strand. *Id*.

Commerce's determination on customer expectations is bolstered by record evidence concerning the pricing of Cablesa's product as compared to the pricing of uncoated or plastic-coated

PC strand. *See generally* Domestic Industry Comments on Cablesa's March 17, 2004 Questionnaire Response (March 30, 2004) at 3, 7-8.  In particular, the Domestic Industry questions the veracity of Cablesa's assertion that it made substantial investments to electro-galvanize its product, arguing that the statement makes no "economic sense" since "there is no market" for the zinc-coated product (other than the market for uncoated PC strand).  *See generally* Def.-Ints.' Brief at 32-33.

In response, Cablesa states that it has been shipping its zinc-coated product to the U.S. "since 1996 at the direct request of customers," and points to purchase orders, quality certificates, and customer affidavits in support of its claim.  *See* Cablesa Brief at 34.  As discussed above, however, there are significant inconsistencies in those documents.  Those inconsistencies, coupled with the record evidence summarized above (establishing that customers have no different expectations for Cablesa's zinc-coated PC strand, as compared to subject PC strand) adequately justified Commerce's conclusion as to the second Diversified Products criterion.

### c. End Use

As to the third Diversified Products criterion, Commerce found that Cablesa's zinc-coated PC strand has no end uses that are different from those of subject PC strand.  *See* Final Scope Determination at 8.  Significantly, Cablesa concedes that the end uses for its zinc-coated PC strand are the same as those for plastic-coated PC strand.  *See* Pl.'s Brief at 34.  Although – as Cablesa emphasizes – that fact is not alone "dispositive" (*see id.*), it is yet another piece of evidence supporting Commerce's conclusion that Cablesa's zinc-coated PC strand is covered by the Antidumping Order.

Other evidence similarly supports Commerce's finding of identical end uses for Cablesa's zinc-coated PC strand and the subject merchandise, including product information provided by certain of Cablesa's customers. *See generally* Domestic Industry's Rebuttal Letter (April 23, 2004) at 6 & Att. 4. Cablesa cites to two affidavits in response. *See* Pl.'s Brief at 35-36. But, as the Domestic Producers emphasize in their brief, the affidavits on which Cablesa relies do not say as much as Cablesa suggests, and are otherwise of limited utility. *See generally* Def.-Ints.' Brief at 34-35.

Finally, Cablesa contends that Commerce incorrectly concluded that its product could not be used in exposed environments. But even the Burns Affidavit that Cablesa relies on controverted Cablesa's position. *See generally* Def.-Ints.' Brief at 35. Moreover, Cablesa pointed to no evidence that its zinc-coated strand had actually been used in such an application. The purchase orders that Cablesa points to do not establish such actual use. Indeed, the record evidence seems to indicate that the PTI Barrier Cable specification that Cablesa cites actually requires zinc coating weights in compliance with ASTM A-475. *See* Domestic Industry's Factual Information Submission (March 19, 2004) at Att. 1. Because the zinc coating on Cablesa's PC strand does not meet the ASTM A-475 standard, it could not be used in such applications.

Like Commerce's conclusions as to the first two criteria, its conclusion as to the third criterion in its <u>Diversified Products</u> analysis is supported by substantial evidence in the record. Commerce thus did not err in concluding that the end uses of Cablesa's zinc-coated PC strand are the same as those of subject PC strand. And that conclusion lends further support to the agency's finding that Cablesa's zinc-coated PC product is within the scope of the Antidumping Order.

d.  Channels of Trade

In evaluating the fourth and final criterion of its Diversified Products analysis, Commerce found that Cablesa sells all PC strand (whether zinc-coated or not) through the same channel of trade – specifically, distributors.  *See* Final Scope Determination at 7.  Although Cablesa seeks to dismiss that fact as "largely irrelevant," the criterion is – as the Domestic Producers note – drawn directly from the court's opinion in Diversified Products and specifically codified in Commerce's regulations.  *See* Pl.'s Brief at 36; Def.-Ints.' Brief at 36.

Cablesa seeks, in effect, to recast the criterion to inquire not whether Cablesa's zinc-coated PC strand and the subject merchandise are sold through the same channel of trade, but – rather– whether galvanized PC strand that is sold pursuant to the ASTM A-475 specification is sold through a different channel of trade.  *See* Pl.'s Brief at 36.  However, Cablesa's proposed inquiry is at odds with the plain language of the applicable regulation.  Further, the record is devoid of evidence on point, because Cablesa does not manufacture galvanized PC strand that is produced to the ASTM standard.

More to the point, the record indicates that Cablesa not only employs the same channel of trade for both subject PC strand and zinc-coated PC strand; Cablesa also sells both products to the same customers.  *See* Final Scope Determination at 7-8.  That fact provides further strong support for Commerce's conclusion that Cablesa's zinc-coated PC strand shares all pertinent physical characteristics, end uses, and channels of trade with subject PC strand, and that Cablesa's zinc-coated product – like all other PC strand – is within the scope of the Antidumping Order in this case.

### III.  <u>Conclusion</u>

For all the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record

is denied, and the Commerce Department's Final Scope Determination is sustained.

Judgment will enter accordingly.

_____/s/_____

Delissa A. Ridgway
Judge

Decided:   March 1, 2007
             New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

CABLESA S.A. DE C.V.,                          :

            *Plaintiff*,          :

        v.                              :

UNITED STATES,                                 :

            *Defendant*,          :      Court No. 05-00388

        and                            :

AMERICAN SPRING WIRE CORP.,                    :
  INSTEEL WIRE PRODUCTS COMPANY,
  and SUMIDEN WIRE PRODUCTS CORP.,            :

         *Defendant-Intervenors*.  :

## **JUDGMENT**

This case having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

NOW, therefore, in conformity with said decision, it is

ORDERED that Plaintiff's Motion for Judgment on the Agency Record is denied; and it is further

ORDERED that the U.S. Department of Commerce's Scope Inquiry Final Determination in Prestressed Concrete Steel Wire Strand from Mexico, Inv. No. A-201-831 (June 16, 2004) is sustained; and it is further

ORDERED, ADJUDGED and DECREED that this action be, and it hereby is, dismissed.

_____
/s/
Delissa A. Ridgway
Judge


Dated:   March 1, 2007
         New York, New York